[No. A105457. First Dist., Div. One. June 9, 2005.]

TRAVELERS CASUALTY AND SURETY COMPANY, Plaintiff and Appellant, v.
EMPLOYERS INSURANCE OF WAUSAU, Defendant and Respondent.

COUNSEL

Morison-Knox Holden Melendez & Prough, William C. Morison-Knox, Michael D. Prough and Philip D. Witte for Plaintiff and Appellant.

Black, Compean & Hall, Kimberly R. Arnal, Robert H. Black and Frederick G. Hall for Defendant and Respondent.

OPINION

**MARCHIANO, P. J.**—Carpet companies sued the manufacturers of a latex mix used in carpet backing. The manufacturers tendered the claims to their insurers that provided products liability coverage. One insurance company provided coverage. The other did not. After the underlying cases were resolved, the two insurance companies engaged one another in a lawsuit involving the intricacies of the relationship of policy exclusions.

Travelers Casualty and Surety Company (Travelers) appeals from a judgment in its equitable contribution action against Employers Insurance of Wausau (Wausau) applying exclusions for products-completed operations coverage and premises coverage. We conclude that an exclusion in the Wausau policy pertaining to premises-operations coverage involving the claim of Western Dyeing and Finishing Corporation (Western) does not apply to damages arising under the products-completed operations coverage, and therefore Wausau had a duty to defend until that action was concluded. Accordingly, we will reverse a portion of the judgment and remand the matter for further proceedings.

## BACKGROUND

This appeal concerns insurance coverage for two lawsuits filed against Mydrin, Inc. (Mydrin), and its predecessor, R&D Latex, Inc. (R&D), manufacturers of liquid latex. Both suits were filed by carpet manufacturers that had purchased latex carpet backing that proved to be defective and resulted in complaints from the customers of the carpet manufacturers. The uncertainty as to insurance coverage and the meaning of certain coverage exclusions is related to a series of corporate combinations culminating in the merger of R&D and Mydrin in August of 1990. Consideration of the issues involves an understanding of the nature of the insurance coverage provided by Wausau and the application of specific exclusions.

*Acquisition of R&D and Insurance Coverage*

On May 8, 1989, BTP Acquisition Corp., a California subsidiary of BTP plc (United Kingdom) (BTP), acquired all of the shares of stock of R&D.

Two mergers ensued, concluding in the August 1, 1990 merger of R&D into a subsidiary of BTP, named Backings, Inc. At the time of the merger, Backings, Inc., changed its name to Mydrin, Inc., and R&D ceased to exist.

Prior to the acquisition and mergers, Travelers insured R&D, located at 5901 Telegraph Road, in Commerce, California, under a commercial property and commercial general liability (CGL) policy from February 24, 1988 to February 24, 1989.

After the second merger and name change to Mydrin were complete, Wausau issued CGL policies to BTP Holding Company, Inc., for the period from October 1, 1990 to March 31, 1992.[1] The Wausau policies contained two exclusions relating to R&D that formed the basis for Wausau's later denial of coverage.[2]

*Wausau's Investigation of the Underlying Complaints*

On November 7, 1991, Royalty Carpet Mills, Inc. (Royalty), filed a complaint naming R&D and Mydrin as defendants and alleging breach of contract and breach of implied and express warranties. The complaint alleged that starting in 1986, Royalty purchased latex mix from R&D for use as a backing in carpet manufactured by Royalty. Royalty alleged that changes in the latex mix caused failure of the carpets and complaints from Royalty's customers beginning in late 1988. The complaint alleged that Royalty stopped doing business with R&D in October of 1989. The complaint also alleged on information and belief that Mydrin merged with R&D on August 1, 1990. Royalty alleged that it "has received and continues to receive" claims of defective carpets attributable to the latex mix. Royalty filed an amended complaint on March 10, 1992, containing no alterations relevant to this case.

Western also experienced problems with the latex mix and sent a claim to Mydrin.

---

[1] Presumably, the Wausau policy was referring to Mydrin's parent company, BTP. A subsequent endorsement added Mydrin as an additional named insured. Later endorsements changed the named insured to Mydrin, and listed BTP Holding, Inc. as an additional named insured.

[2] Wausau issued two umbrella policies, which are not at issue in light of the trial court's determination. Also, Birmingham Fire Insurance Company of Pennsylvania (Birmingham) insured R&D under a CGL policy effective February 24, 1990 until February 24, 1991. Commerce and Industry Insurance Company (C & I) issued a CGL policy to Mydrin covering the period from February 24, 1991 to February 24, 1992. The C & I policy contained an exclusion labeled: "All Hazards in Connection with Designated Premises," that excluded all coverage for injury or damage arising out of the insured's ownership or use of its Calhoun, Georgia premises, operations on those premises or "goods or products manufactured at or distributed from those premises."

Mydrin tendered the Royalty complaint and information regarding the claim (but not the complaint) of Western to Travelers and Wausau in late 1991. Travelers agreed to defend Mydrin in both actions.

Donna Biller initially handled the claim for Wausau. On March 25, 1992, Biller wrote to Mydrin's counsel acknowledging receipt of the Royalty summons and complaint and denying coverage. In a detailed three-page letter, Biller stated that it was questionable whether property damage was caused by an occurrence during the policy period. She also cited a number of exclusions that Wausau does not currently rely on to support the denial of coverage.

Biller also stated: "Further, endorsement number 17 in the '90–'91 policy and endorsement number 4 in the '91–'92 policy exclude coverage for liability arising out of products manufactured by R&D Latex, Inc. Based on facts we have to date, the only reason Mydrin, Inc. is named in this suit is as a direct result of the products manufactured by R&D Latex, Inc. Therefore, no coverage is provided for Mydrin." She also stated that Wausau would not participate in the defense of the action.

Although both policies also contained exclusions from the general liability premises and operations coverage for R&D, Biller did not mention those exclusions in her denial letter. Regarding the Western claim, Biller stated that the occurrence fell outside the policy period and noted that Mydrin had not yet sought a defense of that claim. Nevertheless, she denied coverage and a defense for the same reasons as she had given for the Royalty action.

On or about May 6, 1992, Western filed a complaint for breach of contract and breach of express and implied warranties naming only Mydrin as a defendant. The Western complaint alleged that it purchased defective latex compound from Mydrin from approximately May 15, 1988 through and including January of 1992. Mydrin tendered the complaint to Wausau in June of 1992.

On September 10, 1992, Biller wrote to Mydrin's attorney, Raymond Riley, acknowledging receipt of the complaint in the Western case. She requested information regarding "which entity manufactured the product in question in this litigation" as well as when the product was manufactured and under what company's name it was manufactured and distributed. She sent copies of the policies to Riley.

Riley reviewed the policies and responded on October 6, 1992. He objected to the denial of a defense in the Royalty claim and enclosed Royalty's first amended complaint. He also pointed out that Western alleged that it received defective latex from Mydrin from 1988 to January of 1992.

Riley told Biller that it was not clear whether or not some of the defective latex was manufactured by Mydrin as well as R&D. He asked Biller to participate with the other insurers of R&D and Mydrin.

On October 26, 1992, Wausau claims specialist Donald Smith took over handling of the Royalty and Western cases. Smith attended a meeting with Mydrin's counsel and other insurance carriers in early November of 1992, where he explained the exclusion in the Wausau policies for R&D's products. In a letter dated November 24, 1992, Mydrin's counsel told Smith that the issues in the Western action involved allegations that the defective latex was manufactured and supplied by Mydrin itself, and that R&D was not a defendant in that action.

Smith reviewed documents produced by Western during discovery that included invoices for the defective latex. Some of the invoices were from R&D and some were from Mydrin. Smith's understanding was that the latex at issue was manufactured at the former R&D Latex plant in Commerce, California. He believed that any product coming from the Commerce plant was excluded from all coverage.

On April 21, 1993, Smith attended a meeting with the other insurance carriers. At that time, he argued that because the Birmingham and C & I policies provided coverage concurrent with Wausau's policies, neither the policyholder nor Wausau intended that Wausau's coverage would extend to R&D products, "even if the products were manufactured after Mydrin's acquisition of R&D Latex." Smith concluded that because the other carriers did not argue to the contrary, they were all convinced of the validity of his argument and that Wausau no longer needed to monitor the case unless Mydrin filed an action for bad faith.

Smith did not reject Mydrin's tender of the Western complaint in writing. In March of 1994, when Mydrin's counsel requested a written response from Wausau, Smith merely sent a copy of Biller's March, 1992 denial of coverage, issued before the Western complaint had been filed. Wausau closed its file in March of 1994.

The Western action settled in early 1998. The parties settled the Royalty action in November of 2000.

*Travelers's Contribution Action*

On September 28, 2001, Travelers filed this action against Wausau seeking equitable contribution for amounts it expended in the defense and indemnification of Mydrin in the Royalty and Western actions. Both parties moved for

summary adjudication of the issues of Wausau's duties to defend and indemnify Mydrin in the Royalty and Western actions.

In its motion, Wausau argued that a second exclusion in its policies exempted liability for any postmerger product distributed from or produced at the former R&D plant in Commerce, California. Travelers argued that Wausau's duty to defend began at the time of tender by Mydrin and that no exclusion conclusively eliminated the potential for coverage.

The trial court granted Wausau's motion on the issue of Wausau's duty to defend Mydrin in the Royalty action. As to the Western action, the court granted Travelers's motion in part, finding that Wausau raised triable issues of material fact as to a part of that claim. The court explained that the duty to defend on the Western claim was triggered by tender of the original complaint, "no later than September 10, 1992." The court stated that it did not have sufficient undisputed facts to determine whether or not the duty to defend terminated at the April 23, 1993 meeting of insurers, or at some later time and ordered a trial on that issue.

In March of 2003, the court held a three-day bench trial. The court determined that two Wausau policy exclusions precluded coverage, not only for products manufactured by R&D, but for any products originating from the former R&D facility, regardless of whether the product was manufactured by Mydrin or by R&D. The court found the Wausau policy provisions were ambiguous and relied on its analysis of the reasonable expectations of the insured, as evidenced by Wausau's calculation of premiums on locations other than the Commerce facility and the existence of other insurance coverage for Mydrin's California operations. The court entered judgment in favor of Travelers for one-half the costs of the defense in the Western case only for the period of September, 1992 to April 21, 1993, and against Travelers on the Royalty claim.

Judgment was entered in the amount of $10,594.95 to Travelers for the specified portion of the Western action. Travelers filed a notice of appeal on February 6, 2004. The judgment was amended in March of 2004 to include costs in favor of Wausau in the amount of $21,527.99.

## DISCUSSION

The essential facts underlying this case are not disputed. Travelers insured R&D from February 24, 1988 to February 24, 1989. R&D merged with Mydrin in August of 1990 and Mydrin was the surviving corporation. Wausau insured only Mydrin from October 1, 1990 to March 31, 1992. The Royalty action alleged damages caused by defective latex purchased from R&D

during a business relationship with R&D from 1988 until October of 1989. The Western action alleged damages from defective latex purchased from Mydrin from May 15, 1988 through January of 1992. Travelers defended the actions for part of the time and Wausau did not.[3]

Whether or not Wausau owed a duty to defend and/or indemnify Mydrin that would entitle Travelers to equitable contribution turns on an interpretation of the Wausau policies and exclusions.

Based on our reading of the terms of the Wausau policies, we will affirm the judgment as to the Royalty claim, but reverse in part as to the Western claim. The evidence established that the Western complaint was tendered to Wausau in June of 1992. The matters alleged in the Western complaint triggered Wausau's duty to defend Mydrin. Wausau failed to present evidence to establish there was no potential for coverage. Therefore, Wausau's duty continued until the underlying suit was concluded.

*An Insurer's Right to Equitable Contribution*

█ " 'In the insurance context, the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others.' " (*Low v. Golden Eagle Ins. Co.* (2002) 101 Cal.App.4th 1354, 1361 [125 Cal.Rptr.2d 155].) "Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1293 [77 Cal.Rptr.2d 296] (*Fireman's Fund*); see *Hartford Casualty Ins. Co. v. Travelers Indemnity Co.* (2003) 110 Cal.App.4th 710, 724–727 [2 Cal.Rptr.3d 18].)

The right to contribution arises, not from the insurance contract itself, but from " ' "equitable principles designed to accomplish ultimate justice in the bearing of a specific burden. As these principles do not stem from agreement between the insurers[,] their application is not controlled by the language of their contracts with the respective policy holders." ' [Citation.] [¶] Even so, absent compelling equitable reasons, courts should not impose an obligation on an insurer that contravenes a provision in its insurance policy. [Citation.]" (*Truck Ins. Exchange v. Unigard Ins. Co.* (2000) 79 Cal.App.4th 966, 974 [94 Cal.Rptr.2d 516].) Courts " ' "should consider the nature of the claim, the relation of the insured to the insurers, the particulars of each policy and any other equitable considerations." ' [Citations.]" (*Ibid.*)

---

[3] Mydrin claimed a right to coverage under the Travelers policy as the successor to R&D.

In light of the essentially undisputed facts underlying this case, we look to the policy provisions, the nature of the claims made and other equitable concerns that may be applicable in evaluating Travelers's claim.

*The Duty to Defend*

■ "It is by now a familiar principle that a liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. [Citation.] As we said in *Gray* [*v. Zurich Insurance Co.* (1996) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168]] " 'the carrier must defend a suit which potentially seeks damages within the coverage of the policy.' [Citation.] Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.] [¶] The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. [Citation.]" (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792].)

"The defense duty is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded [citation], or until it has been shown that there is *no* potential for coverage . . . ." (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153] (*Montrose*).)

*Wausau's Duty in the Royalty Action*

■ Wausau's policies were "occurrence" policies, applicable to covered losses that occurred during the policy period. (*A. C. Label Co. v. Transamerica Ins. Co.* (1996) 48 Cal.App.4th 1188, 1192 [56 Cal.Rptr.2d 207] [occurrence policy covers losses so long as damage occurs during policy period].) Travelers argues that the Royalty complaint alleged that carpets manufactured with R&D's latex continued to fail into the Wausau policy period. It also contends that Royalty sued Mydrin for its own negligence in providing technical advice and services in response to customer complaints.

The Royalty action alleged damages caused solely by products supplied by R&D before the merger with Mydrin. The Wausau policy exclusion for R&D products precluded any possibility of coverage for these claims and the trial court correctly entered judgment for Wausau on the Royalty claim.

*Factual Background*

The original and first amended complaints alleged that Royalty stopped buying latex from R&D about October of 1989. The company named Mydrin did not exist until the merger in August of 1990. No additional facts were presented that indicated Mydrin itself manufactured, sold, handled, distributed or disposed of the defective product.

The first two Royalty complaints alleged the August 1990 date of the merger and did not allege facts regarding negligent advice by Mydrin regarding the R&D product. It was apparently not until the fourth amended complaint that Royalty added general allegations that R&D and Mydrin both failed to provide meaningful technical advice to mitigate the problems caused by the defective latex. The fourth amended complaint also contradicted the prior factual allegations by alleging that the merger of Mydrin and R&D took place in May of 1989.

Even if the additional allegations would have triggered Wausau's duty to defend, Mydrin never tendered the later complaint to Wausau. An insurer has no duty to continue to investigate the potential for coverage after it makes an informed decision on coverage at the time of tender. (*Gunderson v. Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106, 1114 [44 Cal.Rptr.2d 272].) "Once it determined on the basis of the lawsuit itself and the facts known to it at that time that there was no potential for coverage, [the insurer] did not have a continuing duty to investigate or monitor the lawsuit to see if the third party later made some new claim, not found in the original lawsuit." (*Id.* at p. 1117.)

Mydrin's potential liability in the Royalty action could only have resulted from its legal responsibility for R&D's products. This possibility was foreclosed by a Wausau policy exclusion. Even if we considered the later allegations of Mydrin's own negligent advice and service, the applicable exclusion still precludes liability, as we now explain.

*Application of the R&D Exclusion*

The basic definition of "Your product" in the Wausau policy was: "Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by: (1) You; (2) Others trading under your name; or (3) A person or organization whose business or assets you have acquired . . . ." The policy definition of "Your product" also included: "(a) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product,' and (b) The providing of or failure to provide warnings or instructions."

Wausau exclusion No. 17 in the 1990 policy and No. 4 in the 1991 policy were headed, "Exclusion Endorsement—Designated Products," and provided: "This endorsement modifies insurance provided under the following coverage parts . . . Commercial General Liability Coverage Part Products/Completed Operations Liability Coverage Part. . . . This insurance does not apply to 'bodily injury' or 'property damage' included in the 'Products—Completed Operations Hazard' and arising out of any of 'Your Products' designated in the Schedule." The schedule referred, inter alia, to "[a]ll products manufactured by R and D Latex, Inc."

The plain meaning of this policy endorsement is that it excludes coverage for damage arising out of R&D products, which are defined to include warnings, representations, instructions or lack of instructions regarding the products of R&D. Because no products were purchased after October of 1989, only R&D products were implicated by the Royalty complaint and those products and any representations or instructions given by Mydrin relating to the R&D products are clearly within the exclusion. R&D products were excluded under any circumstance. In light of these facts, the Royalty complaint was not a suit that even potentially sought damages covered by the Wausau policies. Wausau had no duty to defend or to indemnify and therefore owes no duty of equitable contribution to Travelers for its defense of its own insured. The court correctly entered judgment in favor of Wausau as to the Royalty action.

*Wausau's Duty in the Western Action*

The Western action, unlike the Royalty action, named only Mydrin as a defendant. The complaint alleged that Western purchased defective latex compound from Mydrin after the merger through and including January of 1992. Although these facts were sufficient to trigger Wausau's duty to defend its insured, Wausau denied coverage before the complaint was filed and relied on the same denial letter after Mydrin tendered the complaint and throughout the course of this litigation.

The Western action concerned not only premerger products supplied by R&D (and therefore subject to the R&D products exclusion), but also alleged that Mydrin itself supplied some of the defective latex. As the trial court determined, these allegations are not disposed of by the R&D products exclusion. We part company with the trial court's decision because we also determine that the plain language of the R&D premises exclusion does not preclude the potential for coverage for Wausau's insured.

*Factual Background*

At the trial, Don Smith of Wausau admitted that Mydrin's attorney had informed him that some of the defective latex was manufactured by Mydrin

itself. When Smith received discovery documents from the Western litigation, he reviewed invoices for the latex product and saw that some invoices were from R&D and some were from Mydrin. Smith's understanding was that all of the latex at issue in the Western action, whether it was manufactured by R&D or by Mydrin, came from the former R&D plant in Commerce, California. In Smith's opinion, the policy exclusion from the premises and operations coverage applied if Mydrin manufactured the latex at the Commerce, California plant.

In ruling on the motions for summary adjudication, the trial court determined that the complaint was tendered to Wausau "no later than September 10, 1992," and that the tender triggered Wausau's duty to defend.[4] The court explained that resolution of the issue of when Wausau's duty ended would involve consideration of the meaning of the premises and operations exclusion relating to R&D. After the trial, the court issued a statement of decision in which it concluded that Wausau performed an appropriate investigation and correctly concluded at the April 21, 1993 meeting, that the source of the products sold to Western was the Commerce facility, which was excluded from coverage. The court found the exclusion ambiguous because it failed to specify the address of the included premises.

### Application of the R&D Exclusion

■ Although we agree with the trial court's observation that the R&D premises and operations exclusion failed to specify the Commerce location, we do not agree that omission renders the exclusion ambiguous when it is viewed in the context of the entire policy. When interpreting an insurance policy, "the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. ([Civ. Code,] § 1639.)" (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821–822 [274 Cal.Rptr. 820, 799 P.2d 1253].)[5]

Rather than begin our analysis with the language of the exclusions, we first review the coverage provisions of the Wausau policy. The insurance contracts at issue are CGL policies. The declarations page of the Wausau policy lists

---

[4] The trial court expressed its mistaken belief that the complaint was tendered on September 10, 1992, but agreed that the duty to defend ran from the date of tender. September 10 was the date of Biller's letter, which acknowledged receipt of the May 6, 1992 complaint "[i]n June of this year." It appears that June of 1992 was the correct date of tender.

[5] We recognize there is competing authority as to whether the rule of construing ambiguities in insurance policies against the insurer applies in a contribution action between two insurers. (See, e.g., Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2004) ¶¶ 4:77–4:79, p. 4-30, and cases cited therein.) Because we find no ambiguity in the policy language and exclusions, we do not address that issue.

the applicable coverages with separate limits for the general aggregate limit other than products-completed operations ($2 million), the products-completed operations aggregate limit ($1 million), the personal and advertising injury limit ($1 million) and per occurrence, fire and medical expense limits.

The policy defines the "products-completed operations" coverage as including: "all 'bodily injury' and 'property damage' occurring *away from premises you own* or rent and arising out of 'your product' or 'your work' except: (1) Products that are still in your physical possession; or (2) Work that has not yet been completed or abandoned." (Italics added.) Wausau exclusion No. 17 in the 1990 policy and No. 4 in the 1991 policy expressly modified only the "Products/Completed Operations Liability Coverage" and excluded from that coverage bodily injury or property damage arising out of "[a]ll products manufactured by: R and D Latex, Inc." By its terms, this exclusion applies to liability arising out of R&D products that cause injury or damage after they have left the insured's hands. (*Fibreboard Corp. v. Hartford Accident & Indemnity Co.* (1993) 16 Cal.App.4th 492, 500 [20 Cal.Rptr.2d 376] (*Fibreboard*).)

The second exclusion (No. 5 in the 1990 and 1991 policies) modified only the general liability coverage and not the products-completed operations coverage. The exclusion was headed, "Exclusion Endorsement—Designated Premises or Operations," and provided: "[t]his endorsement modifies insurance provided under the following: Commercial General Liability Coverage." Directly below was a schedule stating: "Description of premises or operation: R and D Latex, Inc. . . ." That exclusion states that the specified coverage, "does not apply to 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury' arising out of the premises or operations described in the Schedule." The schedule states only: "R and D Latex, Inc." This exclusion is the one that Wausau and the trial court relied on to deny any duty, either to defend or indemnify Mydrin for its defective products because it manufactured and distributed them from the former R&D facility. But the exclusion does not reach that far, and in any event, is not applicable to the Western case, which implicates only the products-completed operations coverage.

■ The court in *Fibreboard* described the two aspects of coverage, explaining that the products-completed operations coverage applies to defects in merchandise or improper workmanship after the product has been completed and distributed. The complimentary "premises-operations" hazard is covered under the general liability aspect of the policy and applies to an injury or loss that results prior to completion of the product and during the manufacturing process while the work is in progress. (*Fibreboard, supra,* 16 Cal.App.4th at p. 500.) " 'The coverages are complementary and not overlapping . . . .' [Citation.] Thus, as a matter of sequencing, 'it is well to recognize

that products liability is a coverage that takes over where premises-operations leaves off . . . .' [Citations.]" (*Ibid.*, citing, inter alia, 7A Appelman, Insurance Law and Practice (1979) § 4508, pp. 340–341 (Appelman).)[6]

In determining products liability coverage, the appropriate focus is on: "the location of the occurrence that produces the bodily injury or property damage and not on the theory of liability. Thus, even though there has been a negligent [act in the] manufacture or sale of [the product] but the accident occurs after possession has been relinquished and away from the premises, it [comes under the] products and completed operations [coverage]. But where [the] manufacturer or contractor retains title . . . or retains possession as a bailee it has been held that the requirement of 'relinquishment of possession' has not been met." (7A Appelman, *supra*, § 4508.01 at pp. 346–348; see also *Fibreboard, supra,* 16 Cal.App.4th at p. 502 [traditional products liability claims are not covered by the premises-operations clause].)

The harm alleged in the Western complaint resulted from products that were completed and had been distributed. The harmful occurrence happened away from the insured premises when the product failed when used by Western and its customers. No information was presented that would invoke the premises-operations coverage or the corresponding exclusion.[7] We do not need to attempt to construe the meaning of the second R&D exclusion because all liability at issue in Western concerned only the products-completed operations coverage. (See *Fibreboard, supra,* 16 Cal.App.4th at pp. 501–502, 509–510 [entire manufacturing process including failure to warn of product hazards and suppression of safety information within ambit of products hazard, rather than premises-operations coverage].)

The Western complaint alleged that products distributed by Mydrin failed after distribution and caused damage in the hands of Western's customers during the Wausau policy period. These facts triggered the duty to defend, as the trial court determined in its summary adjudication order. The Wausau policies excluded coverage for liability arising out of R&D products that had been distributed and for liability arising prior to completion of the product

---

[6] Premises-operations coverage is invoked when liability arises out of an injury or loss that occurs while the work or manufacturing is in progress. It is not products liability insurance. (7A Appelman, *supra,* § 4508 at p. 340.) Examples of injuries covered under the premises-operations coverage include injuries suffered by a shipyard worker while installing insulation at the insured's facility and injuries caused by a subcontractor's negligent construction of a wall that fell on a worker while the job was in progress. (See 14 Couch on Insurance (3d ed. 1999) § 201:71, pp. 201-97 to 201-99, and cases cited therein.)

[7] Wausau itself may have recognized this fact, as it did not cite the premises-operations exclusion as a reason for its written denial of coverage.

before it left the R&D premises. There is no hint of an attempt to exclude every future act by Mydrin solely because it used the former R&D facility to manufacture latex.

When an insurance policy contains clear and unequivocal provisions, the only reasonable expectation to be found is that afforded by the plain language of the terms in the contract. (*Sarchett v. Blue Shield of California* (1987) 43 Cal.3d 1, 15 [233 Cal.Rptr. 76, 729 P.2d 267]; *Van Ness v. Blue Cross of California* (2001) 87 Cal.App.4th 364, 372 [104 Cal.Rptr.2d 511].) Because the language of the policies themselves discloses a clear intent, resort to extrinsic evidence to support a different meaning is not legally permissible.

Moreover, the extrinsic evidence offered by Wausau does not provide equitable grounds for ignoring the policy provisions. The evidence offered by Wausau did not present undisputed facts that " 'conclusively eliminate a potential for liability.' " (*Montrose, supra,* 6 Cal.4th at pp. 298–299.) Wausau argued that Mydrin's premium, which was calculated on a schedule attached to the policy and based on gross sales, did not include sales from the Commerce, California plant. Wausau contends that since Mydrin paid no premium for the Commerce location, it could not have expected coverage for any liability related to that location. It relies on *Fidelity & Deposit Co. v. Charter Oak Fire Ins. Co.* (1998) 66 Cal.App.4th 1080 [78 Cal.Rptr.2d 429] (*Fidelity*) to argue that the absence of the Commerce address in the premium schedule shows that Mydrin had no expectation of coverage for that premises.

The *Fidelity* case involved a company that insured a development corporation for its motel and restaurant business in Arkansas for an annual premium of $293. The court determined that the insurer was not obligated to defend the company in an action for damages caused by defective construction of a 172-unit townhouse development in California. The court relied on the declarations page, stating that the business insured was a motel and restaurant and the modest premium to determine that the California development was not the subject of the Arkansas policy. (*Fidelity, supra,* 66 Cal.App.4th at pp. 1082, 1086.) The case is not remotely similar to the Western complaint, which concerned the same product that Mydrin manufactures and carried a large five-figure annual premium.

In addition, Wausau produced no evidence to explain how the premium was calculated, what the various entries on the schedule meant or to establish that only products from the listed locations were meant to be insured.[8] In any

---

[8] The schedule lists some locations only by state and others with a street address. Some companies show premiums computed by gross sales, while others are computed by area. The first heading is Georgia Calhoun, but shows no gross sales or area, then lists Backings, Inc.,

event, the method of calculating the premium cannot change the plain meaning of the policy language.

Wausau notes that endorsement number one, adding Mydrin as an additional named insured to the 1990 policy states: "Coverage A [bodily injury/property damage coverage] does not apply to 'bodily injury' or 'property damage' that occurred before the *named insured acquired or formed the additional named insured* listed above." Wausau argues that endorsement number one already excludes liability for damage that occurred before the August 1990 merger of R&D and Mydrin. It contends that reading the premises-operations exclusion for R&D as applying only to pre-1990 damage makes it redundant.

But the initial endorsement that Wausau refers to makes no reference to R&D and does not render the other R&D exclusions redundant. At the time of the endorsement, the named insured was BTP and the additional insured was Mydrin. Mydrin had been an existing BTP subsidiary named Backings Inc., prior to the R&D merger. The date that BTP acquired its subsidiary has no impact on the R&D exclusions.

Wausau also discusses the fact that Mydrin had other insurance coverage that specifically applied to its Commerce, California operations. Because this is a contribution action, it presupposes that multiple insurers "insure the same insured and cover the same risk . . . ." (*Fireman's Fund, supra,* 65 Cal.App.4th at p. 1293.) We do not find the presence of other insurance a factor that would negate the specific terms of Wausau's policy. Whether other insurance may apply does not transmogrify the language in Wassau's policy.

The trial court erred by relying on extrinsic evidence to apply the premises-operations exclusion to the products-completed operations coverage that was implicated by the allegations of the Western complaint. The exclusion that applied to the products-completed operations coverage referenced only damage arising out of R&D's products.

Wausau's agent, Smith, admitted that some of the defective latex in the Western case was manufactured and distributed by Mydrin itself. Wausau failed to establish that any. exclusion applied to Mydrin's products and therefore, failed to establish that there was no potential for coverage in the Western case. Consequently, Wausau's duty to defend extended until the Western case was concluded. (*Montrose, supra,* 6 Cal.4th at p. 295.)

the subsidiary later named Mydrin, with two figures for gross sales but no address. We note these features of the schedule only to illustrate that it cannot be interpreted without explanation.

*Evidentiary Rulings*

Travelers argues that the trial court made several erroneous evidentiary rulings at the time of the summary judgment motions and during the subsequent trial. It objects to evidence regarding the insurance contracts issued by other carriers, which it argues was irrelevant to the issue of Wausau's duty to defend Mydrin. Whether or not the trial court considered any irrelevant evidence is not prejudicial in light of the fact that we have independently reassessed the evidence and have not relied on the existence of other insurance in making our determination.

Travelers contends that the trial court should have admitted the fourth amended complaint in Royalty, the second amended complaint in Western and a 1993 motion to consolidate the two cases. We have reviewed those documents and determine that they do not have an impact on the resolution of the relevant issues. As discussed previously, the complaints were not tendered to Wausau. Even assuming the trial court erred in excluding or admitting evidence, Travelers has not shown prejudice, i.e. that a miscarriage of justice occurred as a result of its ruling. (Cal. Const., art. VI, § 13; Evid. Code, §§ 353, 354 [prejudice standard for improper admission or exclusion of evidence is whether error results in miscarriage of justice].)

Travelers also objects to evidence admitted at the trial. In light of our reversal of the court's determination regarding Wausau's duty to defend in the Western matter, Travelers's evidentiary objections to the trial evidence and expert testimony are moot.

*Costs for Photocopying*

Travelers objects to the court's award of Wausau's photocopying costs. Because we are reversing the supporting judgment, the award of costs will be vacated. Code of Civil Procedure section 1033.5, subdivision (b)(3), regarding costs, expressly states that postage, telephone and photocopying charges, except for exhibits are not allowable as costs. Because we remand for trial on the issue of the amount of damages, the issue of costs may be revisited by the trial court.

## DISPOSITION

The portion of the judgment on Travelers's claim for contribution to the cost of defense of the Western action is reversed. The court is instructed to enter a finding in favor of Travelers for contribution to the cost of the defense of the Western action from the date of tender in June of 1992 until the action was concluded.

Because the amount of Travelers's damage claim was never determined by the trial court, the matter is remanded for a determination of the amounts due to Travelers on its contribution claim against Wausau. The portion of the judgment awarding costs to Wausau is vacated and remanded for reconsideration with the issue of damages.

In all other respects, the judgment is affirmed. Each party shall bear its own costs on appeal.

Stein, J., and Margulies, J., concurred.

A petition for a rehearing was denied July 1, 2005.