John P. PRINGLE, Bankruptcy Trustee for the Estate of San Pedro Boat Works, Inc., Plaintiff,

v.

WATER QUALITY INSURANCE SYNDICATE, an unincorporated syndicate organized under the laws of the State of New York; Environmental Pollution Group, Inc., a Corporation organized under the laws of the State of New York; Certain Solvent Lloyd's Underwriters That Subscribed to Environmental Pollution Group, Inc., Policy Nos. 01–02001, 02–02001, 03–02001, 04–02001, 5–02001 and 6–02001, unknown foreign entities organized under the laws of the United Kingdom, Defendants.

Case No. CV 04–08495 DDP (RCx).

United States District Court, C.D. California.

Aug. 6, 2009.

---

CD Michel, William Lee Smith, Michel & Associates, LLP, Long Beach, CA, Wesley H. Avery, Roguemore Pringle and Moore Inc., Los Angeles, CA, for Plaintiff.

David Andrew Tong, Elizabeth A. Kendrick, Joseph A. Walsh, II, Keesal Young and Logan, Long Beach, CA, John M. Woods, Clyde and Co. US LLP, New York, NY, Forrest Booth, Severson and Werson, San Francisco, CA, for Defendants.

**ORDER GRANTING SUMMARY JUDGMENT TO WQIS AND EPG; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

[Motions filed on August 8, 2006, Dkt. No. 72, September 18, 2006, Dkt. No. 97.]

DEAN D. PREGERSON, District Judge.

## I. BACKGROUND

### A. *The City Action*

From approximately 1984 to 2003, San Pedro Boat Works ("SPBW") operated boatyards at Berths 44 and 57 in the Port

of Los Angeles.[1] SPBW used copper-nickel sandblast material in its boatyard operations that it knew to "produce ... slag containing hazardous wastes (i.e., marine paint particles, residue etc.)." (SPBW Reply 3.) Beginning in 1989, the City of Los Angeles (the "City") began investigating SPBW for alleged environmental pollution occurring at Berths 44 and 57. (SGI ¶¶ 6, 30–33.) The City's 1989 investigation led to a June 1990 order requiring SPBW to investigate and remediate any contamination.

In February 1992, SPBW purchased a marine pollution liability insurance policy from Water Quality Insurance Syndicate ("WQIS") with a one-year policy period ("Policy # 8602–*01* "). (SGI ¶ 34.) This policy covered specific pollution liabilities relating to SPBW's ownership and operation of three vessels—two drydocks referred to as AFDL 19 and AFDL 27 (collectively, "the drydocks") and a tugboat/towboat referred to as "Cindy M." (SGI ¶¶ 3–5.) The drydocks were located and operated at SPBW's Berth 57 facility within the Port of Los Angeles. (SGI ¶ 5.) SPBW then requested to renew its policy, and WQIS issued a second policy ("Policy # 8602–*02* "), which expired on February 1, 1994. (SGI ¶¶ 34–35.) From February 1, 1994, through February 1, 2002, SPBW purchased similar marine insurance policies from Environmental Pollution Group, Inc. ("EPG") (collectively the "EPG Policies"). (SGI ¶ 12.) While applying for the WQIS Policies, WQIS contends that SPBW did not disclose certain facts pertaining to the City's investigation into SPBW's potential environmental contamination. WQIS contends that the omitted facts would have been material to its underwriting decisions.

In October 2002, the City sued SPBW for environmental contamination, claiming that hazardous substances generated in the ordinary course of operations had been stored in improper containers at both Berths 44 and 57 (the "City Action"). (SGI ¶ 37.) London Market Insurers Underwriters ("LMI"), SPBW's insurer prior to WQIS, initially funded SPBW's legal fees, but terminated that funding as of October 2006.

B. *The Chapter 7 Bankruptcy Proceeding*

Two months after the initiation of the City Action, in December 2002, SPBW filed for Chapter 7 bankruptcy protection. (SGI ¶ 38.) As part of its bankruptcy petition, SPBW filed a Schedule B, under penalty of perjury, listing all of its personal property assets. (RJN Ex. C; SGI ¶ 9.) The Schedule B form specifically includes a category named "Interests in Insurance Policies." (*Id.*) SPBW did not list its right to bring claims against its insurers WQIS and EPG. (SGI ¶ 10.)

In March 2003, SPBW's bankruptcy trustee John Pringle ("Trustee") filed a motion to abandon certain assets of SPBW's bankruptcy estate not listed in the Schedule B form ("non-scheduled assets"). (SGI ¶ 13.) The Bankruptcy Court granted the Trustee's motion on April 25, 2003. (SGI ¶ 14.) The non-scheduled assets abandoned by the Trustee's motion and the Bankruptcy Court's order consisted of dry docks and cranes; and the motion and order did not mention potential insurance claims against WQIS and EPG. (SGI ¶ 13.)

In April 2003, the City filed with the Bankruptcy Court a motion for relief from the automatic stay[2] to (1) take possession

---

**1.** Unless otherwise noted, all facts relied upon by the Court are undisputed by the parties.

**2.** With the filing of a bankruptcy petition, a self-executing automatic stay is imposed pursuant to 11 U.S.C. § 362 ("§ 362 relief") that enjoins the commencement or continuation of

of Berths 44 and 57 from SPBW and (2) to continue the City Action against SPBW. (SGI ¶ 15.) The Trustee filed a notice of non-opposition and the Bankruptcy Court granted the City's motion. (*Id.*; RJN Ex. H.) The Bankruptcy Court's order stated, in pertinent part:

> "[The City] may enforce its remedies ... to pursue and prosecute its action ... including to obtain a final judgment therein against [SPBW] and to collect or enforce such judgment from any applicable insurance policies of [SPBW] and the insurers thereunder provided that the automatic stay shall remain in effect with respect to collection of any such judgment directly from [SPBW]."

(RJN Ex. I.)

In September 2003, the Trustee moved to abandon the assets of SPBW's bankruptcy estate listed in the Schedule B form ("scheduled assets") back to SPBW. (SGI ¶ 17.) The scheduled assets consisted of accounts receivable, a truck, a tow boat, office equipment, an insurance refund of $13,556, and SPBW's books and records. (*Id.*) The Trustee's motion did not mention the potential claims against WQIS or EPG. (*Id.*; RJN Ex. J.) The Bankruptcy Court ordered SPBW's scheduled assets abandoned in October 2003. (SGI ¶ 18; RJN Ex. K.) Thereafter, the Trustee filed a report stating that SPBW had no scheduled assets of value to the bankruptcy estate. (SGI ¶ 19; RJN Ex. L.) In December 2003, the Bankruptcy Court closed the SPBW bankruptcy proceeding, considering it a "no asset" case. (SGI ¶ 20; RJN Ex. M.) There were no distributions made to SPBW's unsecured creditors. (*Id.*)

### C. *The SPBW Action*

In March 2003, SPBW tendered a claim for defense and indemnification to WQIS and EPG under the respective insurance policies for claims made against it in the City Action. (SGI ¶ 14.) WQIS allegedly learned during its investigation of the claim that SPBW did not disclose facts pertaining to the City's investigation. WQIS contends that such facts are material to its underwriting decisions and SPBW's failure to disclose it during application entitled WQIS to unilaterally rescind the WQIS Policies. (SGI ¶¶ 15–16.)

After WQIS' unilateral rescission, SPBW sued WQIS in August 2004 alleging breach of contract and related claims ("SPBW Action"). WQIS removed the SPBW Action to federal court and counterclaimed for a declaration that the WQIS policies were properly rescinded and are void, and that WQIS therefore has no obligations to SPBW arising thereunder. EPG was added as an additional defendant in December 2005.

### D. *Procedural History*

On August 8, 2006, SPBW filed a motion for summary judgment against WQIS, claiming that WQIS has a duty to defend SPBW in the underlying City Action and that WQIS's counterclaim for rescission is barred by the applicable statute of limitations. On September 18, 2006, EPG filed a motion for summary judgment claiming that SPBW has no standing in the SPBW Action due to its Chapter 7 bankruptcy.

On October 24, 2006 in a hearing before the Honorable Barry Russell, United States Bankruptcy Judge, counsel for all parties discussed the reopening of the bankruptcy estate for a determination by

any judicial proceedings against the debtor. 11 U.S.C. § 362; *Catalano v. Comm'r,* 279

F.3d 682, 686 (9th Cir.2002).

the Trustee of his stake in the rights at issue. At that hearing, counsel for John Pringle, the former Trustee, noted that he needed time to evaluate the value of the claims and determine if he would administer or abandon the claims. Judge Russell ordered the case reopened and that Mr. Pringle be reappointed as Trustee for a determination of the status of the claims.

On January 19, 2007, in part responding to EPG's motion for summary judgment on the ground of SPBW's lack of standing, the Court sua sponte entered an Order Re: Standing of Plaintiff San Pedro Boat Works To Bring This Action on the issue of whether to delay this case for lack of party-in-interest standing. In its Order, the Court found that SPBW was no longer a real party in interest in this matter. In accordance with Federal Rule of Civil Procedure 17, the Court postponed all proceedings pending the decision of the reopened bankruptcy estate to give reasonable time for the real party in interest, the Trustee, to respond. The Court further found that the Trustee, Pringle, did have standing. On January 29, 2007, the Trustee, John Pringle, automatically substituted for debtor SPBW as plaintiff in the instant action by operation of law under 11 U.S.C. § 323 and Federal Rule 17(a). In December 2007 and January 2008, in light of the Trustee's substitution as Plaintiff and the time that had elapsed since the filing of the cross motions for summary judgment, the Court afforded Pringle, WQIS, and EPG the chance to submit supplemental briefing. On January 28, 2008, the Court granted the City of Los Angeles's motion for leave to intervene in the SPBW lawsuit. On the same day, the Court requested further supplemental briefing from Plaintiff Pringle, Plaintiff–Intervenor City of Los Angeles, and Defendant EPG on the question of whether the language of the EPG Policies precluded relief for SPBW, and whether the Court should reconsider its January 2007 Order finding that Pringle had standing. On April 9, 2008, the Court again requested supplemental briefing from Plaintiff Pringle and Defendant WQIS on the question of whether Defendant WQIS had validly rescinded the WQIS policies. Finally, on May 15, 2008, the Court granted the parties further time to supplement the record based on Plaintiff Pringle's representation that there had not had been sufficient time to conduct discovery in this matter. The parties then stipulated to an extension until October 24, 2008, to file their briefing. On that date, the parties submitted extensive supplemental evidence.

The Court now considers the parties' motions for summary judgment.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining a motion for summary judgment, all reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"; and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. However, no genuine issue of fact exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

The Court has before it three motions for summary judgment. Plaintiff moves for summary judgment on WQIS's duty to defend it under its insurance policies. Defendant WQIS moves[3] for summary judgment as to the validity of its rescission of the WQIS policies. Defendant EPG brings a motion for summary judgment against Plaintiff, arguing that Pringle lacks standing because he cannot possibly obtain any relief against EPG. The Court GRANTS both WQIS's and EPG's motions. Plaintiff's motion is DENIED.

### A. *Plaintiff Pringle's and Defendant WQIS's Motions*

In January 1992, WQIS issued to SPBW a one-year term marine insurance policy. The policy insured three vessels: two drydocks permanently located and operated at SPBW's Berth 57 in the Port of Los Angeles; and one tugboat referred to as Cindy M. On March 12, 1993, SPBW renewed the same policy (collectively "WQIS Policies"). Coverage under the WQIS Policies terminated on February 1, 1994.

The pertinent portions of the WQIS Policies read:

[T]he Subscribers to the WATER QUALITY INSURANCE SYNDICATE (WQIS) do hereby agree to:

(1) Indemnify the Assured for such amounts as the Assured shall have become liable to pay and shall have paid as owner or operator of the vessel named on the Vessel Schedule attached to and forming part of this Policy, hereafter the "Vessel", and if more than one Vessel is named, all clauses shall apply as though

a separate Policy had been issued for each,

(2) Reimburse the Assured for such certain other costs and expenses, as described below, which the Assured shall have by reason of or with respect to:

. . .

### SECTION C

Liability imposed under Section 107(a)(1) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (Public Law 96–510), hereafter "CERCLA", and costs and expenses incurred by the Assured for removal, response or remedial action (as "removal", "response" and "remedial action" are defined under Section 101 of CERCLA) for which liability would have been imposed under Section 107(a)(1) of CERCLA had the Assured not undertaken such removal, response or remedial action voluntarily. Liabilities imposed under any other Section or Subsection of CERCLA are specifically EXCLUDED.

WQIS contends that because SPBW failed to disclose certain material facts relating to the City's pollution investigation on the applications[4] for the WQIS Policies, WQIS had the right to unilaterally rescind the Policies. Because validly rescinded policies are null and void *ab initio*, argues WQIS, any obligation potentially arising from those policies, such as the duty to reimburse SPBW for its defense and investigation expenses in the City's lawsuit, is likewise extinguished. Plaintiff Pringle counters that the rescission was not valid, and alternatively rescission is barred by

---

**3.** WQIS's motion originated as an opposition to Plaintiff's motion for summary adjudication on whether WQIS had a duty to defend. After determining it would be in the interest of judicial economy to decide the question of rescission first, the Court converted this brief-ing into a motion for summary judgment by WQIS on the validity of its rescission.

**4.** These applications were oral and not reduced to written form.

the statute of limitations, waiver, and estoppel.

### 1. *Rescission*

#### a. *Legal Standard*

■■■ The parties dispute whether federal admiralty law or California law applies to the insurance policies in this case. The Ninth Circuit has confirmed that vessel liability insurance—which the WQIS policies are—is marine insurance, that "courts should look first to federal admiralty law" in interpreting marine insurance policies, and that *uberrimae fidae* is an "established federal maritime law rule" that applies to such insurance. *Certain Underwriters at Lloyds, London v. Inlet Fisheries Inc.*, 518 F.3d 645, 649–55 (9th Cir.2008). "The doctrine of *uberrimae fidae* imposes a duty of utmost good faith, and requires that an insured fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk." *Id.* at 648 (internal citation and quotation marks omitted). Further, an insured is "obligated to disclose all material information, regardless of a request by" the insurer. *Id.* "An insurer may rescind an insurance contract if it can show either intentional misrepresentation of a fact, regardless of materiality, or nondisclosure of a fact material to the risk, regardless of the risk." *Id.* at 655 (internal quotation marks omitted).

#### b. *Application*

■■■ The Court finds that there is no genuine issue of material fact, as would be necessary to preclude summary judgment, about whether SPBW failed to disclose material information to WQIS when applying for the WQIS policies.

Plaintiff Pringle asserts that WQIS has not provided any evidence of this nondisclosure, but he is mistaken. WQIS has submitted the declaration of Richard Hobbie, President and CEO of WQIS. Hobbie's declaration states that he is familiar with the WQIS underwriting criteria, that he reviewed WQIS' "entire underwriting file relating to" SPBW, and that "there is no evidence" in the file that SPBW disclosed, before applying for the WQIS polices, that (1) "that it used hazardous heavy metal sandblast media aboard the drydocks," (2) "that the marine sediment in the immediate area of the Drydocks was known or alleged to be contaminated with" that same material, (3) "that the Los Angeles County Department of Health raised pollution concerns and issued Notices of Violations relating to the drydocks," and (4) "that SPBW had pollution problems that were being investigated by the Hazardous Materials Control Program at the Department of Health."[5] (Hobbie Decl. ¶¶ 7, 9, 11, 13, 15–18.) Although Hobbie was not the WQIS representative that conducted the application process, which in this case was verbal, Hobbie nonetheless provides competent evidence that WQIS has no record of SPBW ever disclosing the above-mentioned information.

In contrast, throughout the nearly three years and many supplemental briefs presented to the Court since this motion was filed in August 2006, Plaintiff has not alleged or presented evidence that it did disclose: (1) its use of hazardous heavy metal sandblast media aboard the dry-

---

5. Pringle moves to strike the Hobbie declaration on the grounds that Mr. Hobbie fails to demonstrate the requisite personal knowledge because he does not attach the underwriting file upon which he relies. *See* Fed.R.Civ.P. 56(e)(1). The Court declines this request. Rule 56(e)(1) states that "[i]f a paper or part of a paper is referred to in an affidavit," a copy must be attached. Mr. Hobbie does not rely on information in a paper or part of a paper; he relies on the *absence* of information in a file. Therefore, Hobbie's sworn declaration of what he did *not* discover in the file is competent evidence.

docks, (2) the known or alleged contamination of the marine sediment in the immediate area of the drydocks at Berth 57 related to this sandblasting, or (3) the violation notices issued by the City. Instead, Plaintiff argues that it disclosed the fact that it was under investigation by the Los Angeles Department of Health for pollution at Berth 44.

Plaintiff, however, focuses on arguing that (1) allowing verbal insurance contracts like the one in this case constitute bad public policy because the insurer can manufacture alleged nondisclosures after the fact, and that (2) any nondisclosures were not material. As to the first point, Plaintiff Pringle may have a valid concern, but given that he does not in fact dispute the alleged nondisclosures here, the concern is irrelevant.

As to the second, the Court disagrees. Plaintiff spends significant time in its briefs addressing whether sandblast material is in fact hazardous, and what information about any such hazards was so basic in the marine insurance industry that WQIS should have known it by virtue of being such a large player in the field. These arguments miss the most important potential nondisclosure: that, at the time SPBW applied for the WQIS policies, the Los Angeles Health Department and Hazardous Materials Control Program had for several years been investigating possible pollution by SPBW in areas including Berth 57 (where the WQIS-insured drydocks were located), and indeed had issued several Notices of Violation. (*See, e.g.*, Hobbie Decl. Ex. 14, June 7, 1990 Notice of Violation by LA Dep't of Health for "waste paint/paint residue" at Berths 44

and 57); *Id.* Ex. 15 (June 1990 Report of Investigation by Hazardous Materials Controls Program noting soil contamination at Berths 44 and 57); *Id.* Ex. 31 (Nov. 30, 1989 enforcement referral requesting followup inspection of SPBW at Berths 44 and 57 because of allegations of "illegal disposal of sandblasting spent sand offsite").

■ Plaintiff also contends that "compliance with disposal regulations was a common problem for boat yards inspected by [the City] in 1990." The fact that many companies might have been charged with polluting has no bearing on whether the insured has an obligation to disclose such information on an insurance application. It is self-evident that an insured must disclose an ongoing investigation and citations for pollution by a local agency, and that a failure to disclose such information would be material to an insurer's decision to insure.[6] Insurers provide insurance against the possibility of a loss in the future. An ongoing pollution investigation means the loss may have already occurred.

In his final supplemental briefing, Pringle also argues that disclosure of the City's investigation or notices of violations could not have been material to WQIS, because (as WQIS concedes) they would not have evidenced a nexus between the insured drydocks' "discharge" and the contamination, or that the notice of pollution was apparently unrelated to the insured vessels. The implication of this argument is that Pringle could not have advised WQIS of what it, itself, did not know. This argument omits the crucial fact that SPBW was aware that it had received a notice of

---

6. The materiality of the concealed information is determined "solely by the probable and reasonable influence of the [concealed] facts upon the [insurer] in forming [its] estimate of the disadvantages of the proposed contract, or in making his inquiries." Cal. Ins.Code § 334. This is a *subjective* test; the critical question is the effect truthful answers would have had on the insurer at issue, not on some "average reasonable" insurer. *Imperial Cas. and Indem. Co. v. Levon Sogomonian*, 198 Cal.App.3d 169, 181, 243 Cal.Rptr. 639 (Ct. App.1988).

violation in 1989 for waste produced by "discharge" as well as the "disposal" of waste at Berths 44 and 57, resulting from its sandblasting activities. (*See* Walsh Decl. Ex. 8.)

In sum, WQIS has presented uncontested evidence that SPBW failed to properly disclose that it was under a multi-year investigation for pollution by the County of Los Angeles resulting in part from discharges from its vehicles at the time it applied for the WQIS insurance policies. The Court further finds that the full disclosure of such investigation and notices of violation is, under the circumstances of this case and as a matter of law, a material fact. Accordingly, WQIS was entitled to rescind its policy.

### 2. Statute of Limitations, Waiver, Estoppel[7]

Plaintiff argues that WQIS's argument for rescission is barred by the statute of limitations, by waiver, and by estoppel. The Court rejects these contentions.

### a. Statute of Limitations

■■ The California Code of Civil Procedure provides for a four year statute of limitations for "[a]n action based upon the rescission of a contract in writing." Cal. Civ.Proc.Code § 337. However, the California Supreme Court has explained that

a defense may be raised at any time, even if the matter would be barred by a statute of limitations if asserted as the basis for affirmative relief. The rule applies in particular to contract actions. One sued on a contract may urge defense that render the contract unenforceable, even if the same matters, alleged as grounds for restitution after rescission, would be untimely.

*Styne v. Stevens,* 26 Cal.4th 42, 51–52, 109 Cal.Rptr.2d 14, 26 P.3d 343 (Cal.2001).

Plaintiff argues that *Styne* is distinguishable, and that the statute of limitations therefore applies, because *Styne* only applies to defenses based on fraud or misrepresentation, and because WQIS is here acting in an affirmative rather than a defense capacity by "bringing an action for relief based on rescission." (Pringle Rescission Br. 14.) The Court disagrees.

■ First, as to the fraud question, *Styne* explicitly states that the "same reasoning" that excuses fraud and misrepresentation defenses from the statute of limitations "applies to *any* grounds for asserting the illegality of the contract upon which the plaintiff sues." 26 Cal.4th at 52, 109 Cal.Rptr.2d 14, 26 P.3d 343 (emphasis added). Moreover, contrary to Plaintiff's contention, this *is* a case involving fraud or misrepresentation. Indeed, the Court has just found that the undisputed facts showed that SPBW failed to disclose material information when applying for the WQIS insurance coverage.

■ Second, WQIS is not acting in an affirmative capacity here. The California Supreme Court has addressed this issue:

Styne asserts that Stevens has actually sought affirmative relief by asking, in effect, for a declaration that the contract is void and unenforceable. But the cases belie such an argument; one who raises the defense that a contract is illegal and unenforceable necessarily asks for a determination to that effect. If the result the defendant seeks is simply that he or she owes no obligations under an agreement alleged by the plaintiff, the matter must be deemed a defense to which the statute of limitations does not apply.

*Id.* at 53, 109 Cal.Rptr.2d 14, 26 P.3d 343. Here, SPBW brought an action alleging that WQIS owed obligations under the insurance contracts. WQIS responded by asking for a declaration that the contract was void *ab initio*—rescission. WQIS is not seeking any relief based on the rescission other than a declaration of the contract's invalidity. *Cf. id.* at 51–52, 109 Cal.Rptr.2d 14, 26 P.3d 343 (noting that a claim for *restitution* after rescission would be affirmative, rather than defensive (emphasis added)). In light of *Styne*, WQIS's argument must be considered defensive, and therefore the statute of limitations is not applicable.[8]

#### b. *Waiver/Estoppel*

▮ "In the insurance context, California courts have applied the general rule that waiver requires the insurer to intentionally relinquish its right to deny coverage ...." *Ringler Ass. Inc. v. Md. Cas. Co.*, 80 Cal.App.4th 1165, 1188, 96 Cal. Rptr.2d 136 (Cal.Ct.App.2000). Further, "[t]he burden is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and doubtful cases will be decided against a waiver." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 31, 44 Cal.Rptr.2d 370, 900 P.2d 619 (Cal. 1995) (internal alterations and quotation marks omitted). Plaintiff has not met his burden here.

▮ Plaintiff's only evidence that WQIS intentionally relinquished its rights is a March 1993 letter in which in SPBW wrote to its insurers to

formally place [them] on notice ... regarding SPBW's claim for defense and indemnification of all costs associated with SPBW's alleged liability for investigation and remediation of contamination at the above-referenced site ("the site".) In June, 1990, the Los Angeles County Department of Health Services ordered SPBW to conduct an investigation and remediate any contamination found in the northeast section of Berth 44. The lead agency is now the Health Hazardous Materials Division of the Los Angeles County Fire Department ("the County").

(Smith Decl., Ex. 9.) This letter does not provide the requisite clear and convincing evidence. Specifically, the letter refers to only to Berth 44, while the WQIS-insured drydocks were located in Berth 57. Contrary to Plaintiff's suggestion that the "notice is clearly as to potential contamination at the entire site," the "above-referenced site" in fact clearly refers to "Re: Billfish, Inc. dba San Pedro Boat Work, *Berth 44,* San Pedro, CA 90731." (Smith Decl., Ex. 9 (emphasis added).) Moreover, the letter mentions nothing about the actual violations issued, nor does it detail the kind or degree of pollution at issue. Such details would surely be relevant before assuming that WQIS *intentionally* waived related rights. Accordingly, failure to act following receipt of a vague letter about pollution at Berth 44 cannot provide the strong showing necessary to demonstrate intentional waiver of WQIS's rights regarding pollution at Berth 57.

---

**8.** Plaintiff highlights the distinction between effecting a nonjudicial unilateral rescission and obtaining relief pursuant to that rescission in court, but the Court finds that any such distinction, even assuming its legitimacy, is of no consequence here. Court approval of rescission as a form of relief is no different from court approval of any other contract

defense. The California Supreme Court has made clear that urging the invalidity of a contract in response to a lawsuit is considered a defense. Such a declaration may well be a form of relief, but it therefore is nonetheless a relief not subject to the statute of limitations.

■ Plaintiff's estoppel claim also fails because he cannot meet two of the requirements for proving equitable estoppel: that WQIS knew all the relevant facts, or that WQIS intended that its "conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe that it was so intended." *Gaunt v. Prudential Ins. Co. of Am.*, 255 Cal.App.2d 18, 24, 62 Cal.Rptr. 624 (Cal.Ct.App.1967). Plaintiff argues that the 1993 letter provided WQIS with notice of the requisite facts, but as already discussed the letter is insufficiently specific to justify a finding that WQIS intended its silence to be acted upon, or a finding that it was reasonable for SPBW to believe that WQIS so intended.

### 3. Conclusion—Pringle's and WQIS's Motions

Having rejected the statute of limitations, waiver, and estoppel arguments, the Court GRANTS summary judgment in favor of WQIS. The WQIS Policies are hereby officially rescinded, and any duties that might have arisen therefrom are unenforceable. Therefore, Plaintiff's motion for summary judgment that WQIS had a duty to defend arising from these Policies is DENIED.

### B. EPG's Motion

In September 2006, Defendant EPG filed a motion for summary judgment arguing that SPBW was not the real party in interest and, in any case, lacked standing to bring its claim because it had no redressable injury. In January and February 2007, the Court found that SPBW did have standing and allowed Pringle, the bankruptcy trustee, to substitute in as Plaintiff on the grounds that he is the real party in interest. Subsequently, in January 2008, the Court requested supplemental briefing on whether it should reconsider the standing question because the EPG insurance policies left Plaintiff Pringle and Plaintiff–Intervenor City of Los Angeles without a redressable injury. After considering this supplemental briefing, the Court now finds that Plaintiff and Plaintiff–Intervenor have no redressable injury and, therefore, do not have constitutional standing to bring this claim against EPG.

The crux of EPG's argument is that the EPG policies at issue are indemnity, rather than liability policies. Because indemnity policies require that "payment" is a condition precedent to insurer obligation, and Plaintiff has not made any payments, EPG is not responsible. Therefore, EPG argues that Plaintiff and Plaintiff–Intervenor have no redressable injury in fact and lack standing. As described below, the Court agrees.[9]

### 1. The EPG Policies are Indemnity Policies

The EPG policies state in relevant part:

*Limited U.S. Oil Pollution Insurance Policy*

### 1. Insuring Agreement

In consideration of the premium stated herein and subject to all of the terms, conditions and limitations contained herein, the Underwriters do hereby agree to indemnify the Assured for such amounts in excess of the Underlying Limits ... as the Assured shall, [as owner or operator of the Vessel(s) or Facility(s) named on the Declaration pages], have become liable to pay and shall pay, by reason of or with respect to:

---

**9.** In light of this determination, the Court need not reach EPG's argument that Plaintiff Pringle should not have been allowed to substitute in as the real party in interest. The Court also declines to address the question of whether SPBW's bankruptcy affects standing.

*FOURTH:* Costs, charges and expenses incurred, with the written consent of Underwriter, in defending against or investigating or adjusting any liabilities insured against [under the policy]. . . .

## III. *CONDITIONS*

* * * *

### 4. *Attachment of Liability*

 Liability to pay under this Policy shall not attach unless and until the Assured has paid or has paid on its behalf any sum set forth in Sections . . . Fourth.

(Smith Decl. Feb. 11, 2008, Ex. 2, P02–P04.)[10] Insurance contracts can be either liability or indemnity policies. "A liability policy provides coverage for a loss which the insured becomes legally obligated to pay, whereas an indemnity policy provides coverage only for those losses actually paid out by the insured." *Save Mart Supermarkets v. Underwriters at Lloyd's London,* 843 F.Supp. 597, 603 (N.D.Cal.1994). Therefore, indemnity policies are not triggered until the insured has actually paid for its losses.

 The plain language of the EPG policies reveals them to be indemnity policies. *Travelers Cas. and Sur. Co. v. Employers Ins. of Wausau,* 130 Cal.App.4th 99, 115, 29 Cal.Rptr.3d 609 (Ct.App.2005) ("When an insurance policy contains clear and unequivocal provisions, the only reasonable expectation to be found is that afforded by the plain language of the terms in the contract.") Under the contracts at issue here, EPG promised to "indemnify" SPBW the "for such amounts . . . as the Assured shall, . . . have become liable to pay and shall pay." (Pl.2d Am. Comp.Ex.3, 4.) The contract also emphasizes that "[l]iability to pay under this Policy shall not attach unless and until the Assured has paid or has paid on its behalf any sum set forth in Sections." (*Id.*) Accordingly, the contract clearly states that EPG's liability is not triggered "unless and until" SPBW has already paid or payments have been made on its behalf. (*Id.*)

Plaintiff and Plaintiff–Intervenor argue that the policy language is ambiguous because the words "shall have become liable to pay and shall pay" could equally mean "must pay in the future" as well as "has already paid." (*See* Pringle Suppl. Brief Re Standing and Contract Interp. 8 & n. 14.) In the abstract, this argument might have some merit. However, in this case the provision stating that "[l]iability to pay under this Policy shall not attach unless and until the Assured has paid or has paid on its behalf any sum" extinguishes any potential ambiguity and makes clear that "shall pay" indeed means "has already paid."

 Plaintiff Pringle next argues that the policies are not indemnity policies because "what distinguishes indemnity contracts from insurance policies" is that indemnity contracts "include a duty to reimburse certain amounts paid upon judgment ("liability imposed . . . by law")

**10.** Plaintiff has objected to the declaration of EPG's attorney Forrest Booth, which attached as an exhibit the relevant policy provisions, for lack of personal knowledge. In spite of Pringle's suggestion that Booth's representation of the policy language might be inaccurate, the policy language that the parties' both rely on is identical. Because there is no actual dispute over the literal wording of the policies, the Court denies Plaintiff's evidentiary objection as moot. Further, the Court rejects Plaintiff's claim that Booth has not established personal knowledge of the insurance policies because he only attached excerpts to his declaration. Booth has submitted a declaration under penalty of perjury swearing that he has reviewed the policies. He also attached to that declaration what he believed to be the relevant provisions. There is no prohibition on attaching relevant excerpts.

or agreement," but that the "EPG Policies … have no language that conditions reimbursement on judgment or settlement." This is not correct. As noted above, the distinguishing factor between liability and indemnity policies is whether the insured "suffers actual loss by being compelled to pay the claim," not just whether a judgment imposing liability has occurred.[11] *Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A.*, 3 Cal.3d 434, 447, 91 Cal.Rptr. 6, 476 P.2d 406 (Cal.1970). Therefore, contrary to Plaintiff's contention, the EPG policy language is equivalent, though not identical, to the sorts of policies that even Plaintiff and Plaintiff–Intervenor agree are indemnity policies. (*See* Pringle Suppl. Brief Re Standing and Contract Interp. 9 (citing as an example of an indemnity policy *Save Mart Supermarkets v. Underwriters at Lloyd's London*, 843 F.Supp. 597, 603 (N.D.Cal.1994), which had a policy that required the reimbursement of "all *payments* made").)

■ Moreover, the Ninth Circuit has recently emphasized that one of the three defining characteristics of a marine insurance policy is that it is "a contract of indemnity." *Certain Underwriters at Lloyds, London v. Inlet Fisheries Inc.*, 518 F.3d 645, 654–55 (9th Cir.2008). The parties do not dispute that the insurance policies at issue are contracts for "marine insurance." *Inlet Fisheries* confirms what the plain language of the policies already reveals: the EPG Policies at issue in this case are contracts of indemnity, and as such are only triggered upon payments actually made.

## 2. Plaintiff and Plaintiff–Intervenor Have No Constitutional Standing

■ "The irreducible constitutional minimum of standing requires a plaintiff to show injury in fact, causation of that injury by the defendant's conduct, and redressability of the injury by the requested relief." *Pershing Park Villas Homeowners Ass'n v. United Pacific Ins. Co.*, 219 F.3d 895, 900 (9th Cir.2000) (internal quotation marks omitted). The Court finds that Plaintiff and Plaintiff–Intervenor can meet neither the first criterion nor the third.

■ Having found that the insurance policies in question are indemnity contracts triggered only by actual loss and payment of funds by the insured, Plaintiff must show that some funds were actually paid either by SPBW or on its behalf. Otherwise, EPG could not have injured SPBW by failing to reimburse. Plaintiff and Plaintiff–Intervenor concede that SPBW has not made any payments itself. Instead, they argue that SPBW's previous insurer, LMI, has already made payments on its behalf, and that SPBW is responsible for approximately $80,000 of those costs. (Smith Decl. Opp'n to Mot. Summ. J. ¶ 5.)

■ This argument, however, ignores the central components of an indemnity policy, which are the payment of legal liability causing actual loss to the insured.

---

**11.** Indeed, the case Plaintiff relies upon for its "judgment" argument, *In re Liquidation of Pine Top Ins. Co.*, 266 Ill.App.3d 99, 203 Ill. Dec. 129, 639 N.E.2d 168, 170 (1994), supports the Court's conclusion. *Pine Top* states that "[t]he substantive distinction between indemnity and liability policies is that payment of a claim by the insured is a condition precedent to an insured's right to recover under the form, but not that later [sic]." Plaintiff urges that the operative word in this holding is "claim," and that "claim" equals "judgment." The Court believes, rather, that the operative words are "payment" and "condition precedent," and thus articulate the same distinction between liability and indemnity policies as do the authority cited by the Court. To the extent *Pine Top* can be interpreted differently, however, the Court does not find this reasoning persuasive.

See *Superior Gunite v. Ralph Mitzel Inc.*, 117 Cal.App.4th 301, 312, 12 Cal.Rptr.3d 423 (Cal.Ct.App.2004) ("[A]n indemnitor is not obligated for a claim made against an indemnitee until the indemnitee has incurred an actual loss by having paid the claim."). In other words, the loss suffered by the indemnitee must be a consequence of payment, no matter whether that payment is made "by or on behalf of" the indemnitee. *See Alberts v. American Casualty Co.*, 88 Cal.App.2d 891, 899, 200 P.2d 37 (Cal.Ct.App.1948) ("[T]he indemnitor's liability for the loss does not arise until the debt has been paid and the indemnitee has *thus* suffered a loss.") (emphasis added). In this case, a third-party liability insurer, LMI, made payments to reimburse Plaintiff's defense liability, but Plaintiff provides no evidence or allegation demonstrating how these payments caused Plaintiff actual loss. Therefore, this injury cannot be redressed by EPG. Insurance against liability *regardless* of loss is a different contract than the one at issue here; and Plaintiff's argument is essentially another way of saying that his insurance contract includes liability instead of indemnity coverage.

Finally, the City suggests that Trustee Pringle has independent standing because a successful lawsuit would aid the bankruptcy estate by obtaining insurance proceeds. This contention begs the question, because a successful lawsuit is an impossibility if there has been no injury in fact; there is simply no injury to redress.

In sum, the EPG Policies are contracts of indemnity, triggered only by payment by or on behalf of SPBW causing actual loss. There is no dispute that no such payment has been made and, accordingly, there is no loss to indemnify. Therefore, the Court reconsiders its previous Order finding that SPBW had standing. Based on a lack of injury in fact, Plaintiff Pringle lacks standing to bring his claims against

EPG. Consequently, the Court GRANTS EPG's motion for summary judgment.

## IV. CONCLUSION

Based on the foregoing analysis, the Court GRANTS WQIS' request for a declaration of rescission and GRANTS EPG's motion for summary judgment. Pringle's motion for summary judgment that WQIS has a duty to defend is DENIED.

IT IS SO ORDERED.