Filed 3/7/14  Johnson v. 505 West Madison Apartments CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MICHAEL JOHNSON, | D059903 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2007-00075618-CU-PO-EC) |
| 505 WEST MADISON APARTMENTS et al., | |
| Defendant and Respondent. | |

APPEALS from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.

Richard W. Weinthal; Simpson & Moore, Charles Moore; Lafave & Rice and John J. Rice for Plaintiff and Appellant Michael Johnson.

Wade & Lowe (formerly Crandall, Wade & Lowe), Edwin B. Brown; Shewry & Van Dyke and Steven M. Shewry for Defendants and Appellants 505 West Madison Apartments and Delta Property Management Company.

I.

INTRODUCTION

Plaintiff Michael Johnson (Michael)[1] appeals from a judgment entered after a jury trial on his claim of negligence against defendants 505 West Madison Apartments and Delta Property Management Company (the defendants). Michael filed suit after he suffered injuries as a result of a fire in an apartment in which he was staying with his uncle. The defendants cross-appeal from the judgment.

Michael raises four arguments on appeal. He asserts (1) that the trial court erred in reducing his award for past medical damages based on the hospital's having accepted a reduced fee for the services it provided to him, given that there remains a lien on his judgment pursuant to the Hospital Lien Act; (2) that the trial court erred in giving an improvised and "coercive" instruction to the jury when the jury informed the court that it had reached an impasse in its deliberations; (3) that the trial court erred in ruling that he could not seek punitive damages; and (4) that the jury's damage award is inadequate as a matter of law because it fails to award him future noneconomic damages.

The defendants raise eight arguments in their cross-appeal, arguing (1) that Michael has conceded that he did not present sufficient evidence to support his claim that defendants caused the fire; (2) that there is not substantial evidence to support the jury's

_____

[1]     We refer to the plaintiff by his first name because he shares a last name with another party in the action, his uncle, David Johnson, to whom we will refer as David.

verdict that the defendants were negligent[2]; (3) that any negligence on defendants' part was superseded by the negligence of Michael's uncle, who admittedly had removed the apartment's smoke detector from the wall prior to the fire; (4) that there was substantial evidence presented at trial that Michael's injuries were caused by his own diminished judgment as a result of his consumption of alcohol on the day of the fire; (5) that the trial court abused its discretion in allowing an expert called by plaintiff to testify regarding the placement of smoke detectors in apartments; (6) that the trial court abused its discretion in allowing another plaintiff's expert to testify as to the cause of the fire; (7) that the trial court abused its discretion in allowing Michael to present evidence regarding problems with maintenance at the apartment complex, unrelated to smoke detectors; and (8) that the trial court abused its discretion in allowing the jury to hear evidence concerning a faulty lamp that had been disposed of prior to the fire.

We conclude that none of the parties' arguments has merit, and affirm the judgment of the trial court.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

Defendant 505 West Madison Apartments owns the Majestic Apartments, a complex of 215 furnished apartments comprising six buildings. Delta Property

---

[2]    In our discussion section, we consider these first two arguments together, since they are interrelated.

Management Company has managed the Majestic Apartments since 1966. Delta is responsible for furnishing the apartments, including providing the lighting fixtures and lamps, electrical equipment, and smoke detectors.

David, Michael's uncle, rented an apartment at the Majestic Apartments complex. In September 2005, Michael was living in Riverside and was transitioning to a new job in San Diego. Michael stayed with David while he was looking for a place to live in San Diego.

While David and his wife, Serena Johnson, were living in the Majestic Apartments complex, they experienced false or nuisance alarms coming from the smoke detector located in the apartment. The alarm would go off when they were cooking or occasionally when one of them was showering. Eventually, the alarm would go off regularly in the morning when David was making breakfast. As a result of the repeated false alarms, and out of concern that the sound of the alarm might disturb his neighbors, David removed the smoke detector from the wall, disabling it.[3]

---

[3]    Terri Sproul, the resident property manager at the Majestic Apartments, estimated that she had received "one or two complaints per year" from tenants about false alarms related to the smoke detectors. In addition, a maintenance worker at the apartment complex testified that during his semi-annual smoke detector checks, he usually found one or two apartments where the resident had taken the smoke detector off the wall. In response to tenant complaints about the nuisance alarms, Sproul would have maintenance employees install a new smoke detector in the same place as the one that had been emitting nuisance alarms, even though there was no indication that the nuisance alarms were due to the age of the detectors. There was also evidence that one of the defendants' employees knew that someone had taken the detector off the wall in David's apartment, was told that " 'it is always going off,' " and simply replaced the smoke detector.

On the afternoon of September 25, 2005, Michael and two other men went to a San Diego Chargers football game.[4] Michael drank three to four 16-ounce cups of beer at the game. The men dropped Michael off at David's apartment at approximately 10 p.m. that night.

Michael remembered calling his girlfriend on the telephone and talking with her briefly. At some point, he "passed out" on the sofa in the apartment. The next thing Michael remembered was being "face-down somewhere in the apartment."

A next-door neighbor was asleep on her couch when she heard the sound of glass breaking. The neighbor got up, looked out through the peephole in the door to her apartment, and saw flames. She ran out of her apartment and heard Michael screaming.

Firefighters from the El Cajon Fire Department arrived and rescued Michael. Michael was taken to the UC San Diego (UCSD) hospital burn unit, where he was determined to be in critical condition. Michael was placed in an induced coma between September 26 and October 20, 2005. He was released from the hospital on November 11, 2005.

Michael suffered temporary damage to his airway. His airway was healed by the time he left the hospital. When Michael saw a pulmonologist prior to trial, his lungs were in the same condition as they were prior to the fire. The pulmonologist noted that Michael's records disclosed that he had made an "excellent recovery" by the time he left the hospital and was "back to where he was in his previous baseline" of lung health as of

---

[4]     David was out of town on business at the time.

trial. By mid-2006, Michael had returned to work. During his deposition in this case, Michael stated that he could not think of anything he could not do as a result of the injuries he suffered in the fire.

The El Cajon Fire Department completed an investigation into the cause of the fire. Mark Shipley, the administrative chief for the El Cajon Fire Department at the time of the fire, conducted the investigation. Chief Shipley's fire report was entered in evidence. The report states, " 'The cause of this fire is undetermined. Our investigation to date has not revealed sufficient evidence to explain the cause of this fire to the exclusion of all other possible causes.' "

Chief Shipley did determine that the fire originated in the northwest corner of the living room of the apartment. He explained that unless the fire department suspects that a fire was caused by arson, the department normally leaves a determination of the precise cause of a fire up to private investigators.

At trial, the experts for the parties generally identified four different possible causes of the fire: a bong, a candle, the wiring at an electrical outlet, or a lamp. Both parties presented abundant evidence regarding what might have caused the fire, and their respective experts expressed opinions as to why they believed one source was a more likely cause of the fire than the others. However, none of the experts purported to have determined the precise cause of the fire.

B.    *Procedural background*

Michael sued the defendants for his injuries, alleging negligence arising from their status as owner and property manager of the apartments. In an amended complaint,

6

Michael added claims for premises liability, i.e., the failure to use ordinary care and diligence to keep the property free from dangerous conditions and/or failure to warn about dangerous conditions.

Although the relevant pleading is not in the record, it appears that the defendants cross-complained against David for indemnity on a theory of comparative fault.

Prior to trial, the trial court determined that there was insufficient evidence as a matter of law to support a punitive damages award, and ordered that Michael's counsel would not be permitted to mention the subject of punitive damages in front of the jury.

The case was tried to a jury over approximately 14 nonconsecutive days. The jury heard from Michael; David; Terri Sproul, the resident property manager; Mark Shipley, the El Cajon Fire Department investigator; and a number of other witnesses, including multiple expert witnesses.[5]

During its deliberations, the jury sent a note to the trial court indicating that it had reached an impasse. After further instruction from the trial court, the jury continued to deliberate and the following morning, returned its verdicts. The jury indicated on the special verdict form that it found that the defendants had been negligent, that defendants' negligence had been a substantial factor in causing harm to Michael, and that Michael had suffered damages. The jury awarded damages as follows:

"[Michael Johnson's damages are:]

"a. Past [E]conomic Loss:

---

[5] The parties presented the testimony of a total of approximately 40 witnesses at trial.

7

> "Lost Earnings    $29,443
> "Medical Expenses    $762,866.35
> "Total Past Economic Damages    $792,309.35
>
> "b. Past Non-Economic Loss    $300,000
> "[¶] . . . [¶]
>
> "c. Future Non-Economic Loss    $3,118
>
> "TOTAL    $1,095,427.35."

The jury further determined that David had been negligent, that David's negligence was a substantial factor in causing Michael's harm, that Michael, himself, had been negligent, and that Michael's own negligence was a substantial factor in causing harm to himself. The jury divided responsibility for Michael's harm among the parties, assigning 32 percent responsibility to the defendants, 58 percent responsibility to David, and 10 percent responsibility to Michael.

The defendants filed a motion for judgment notwithstanding the verdict, or, in the alternative, to reduce the medical expenses portion of the past economic damages award to the amount that UCSD had accepted as full payment for Michael's medical services. After hearing argument on the matter, the trial court granted the defendants' motion to reduce the award for past medical expenses to the amount that County Medical Services had paid, and UCSD had accepted, as full payment for Michael's medical care: $74,433.

The trial court entered judgment on April 7, 2011, and Michael served notice of entry of judgment four days later. In early May, Michael filed a notice of intent to move for a new trial. A few days later, the defendants filed a motion for judgment

8

notwithstanding the verdict.  The trial court heard argument on both motions on the same day, and denied both.

III.

DISCUSSION

A.    *Michael's appeal*

1.    *The trial court did not err in reducing the amount of the damages awarded for past medical costs*

Michael contends that the trial court erred in reducing the jury's award of past medical expenses from $762,866.35 to $74,433, based on UCSD's having accepted the lesser amount from the County of San Diego's County Medical Services (CMS) as payment in full for Michael's care.[6]

a.    *Additional procedural background*

After the jury rendered its verdicts, defendants filed a motion for judgment notwithstanding the verdict, seeking to overturn the jury's determination that the defendants were partially responsible for Michael's injuries.  In their moving papers, the defendants included an alternative request in which they asked the court to reduce the jury's award of past medical expenses to conform to the amount that Michael's medical

---

[6]    CMS paid for the services that Michael received from UCSD because he lacked of health insurance and was indigent.

9

providers had accepted as payment in full for their services, if the court did not grant their motion for judgment notwithstanding the verdict.[7]

After full briefing on the matter, the trial court held an evidentiary hearing to allow the parties to present evidence related to a lien that UCSD had perfected under the Hospital Lien Act (HLA) (Civ. Code, §§ 3045.1–3045.6) pertaining to any judgment that Michael might receive in this action. At that hearing, Christina Diaz, the manager of in-patient services at UCSD, testified as the most knowledgeable person at UCSD regarding Michael's hospital bill and the medical services provided to him. Diaz is also the person who decides whether to file a lien pursuant to the Hospital Lien Act. The trial court admitted in evidence a copy of a contract between UCSD and CMS governing payment to UCSD for services provided to CMS patients.

After the presentation of evidence and argument from the parties' attorneys, the trial court denied defendants' motion for judgment notwithstanding the verdict, but granted their request to reduce the damages award for past medical expenses from $762,866.35 to $74,433, based on evidence that $74,433 is the amount that UCSD accepted as payment in full for the services that it provided to Michael.

---

7    Defendants had apparently requested the opportunity to present evidence to the jury regarding the amount that Michael's medical providers had accepted as satisfaction for their services. The trial court denied that request and instead ruled that it would decide whether Michael's damages for past medical expenses should be reduced pursuant to the authority of *Hanif v. Housing Authority* (1988) 200 Cal.App.3d 635 (*Hanif*), after the jury rendered a verdict.

10

b.      *Analysis*

In tort actions, medical expenses fall generally into the category of economic damages that represent actual pecuniary loss suffered by the plaintiff and caused by the defendant's wrong.  (See Civ. Code, § 1431.2, subd. (b)(1).)  Pursuant to the rule announced in *Hanif*, *supra*, 200 Cal.App.3d at page 641, "an award of damages for past medical expenses in excess of what the medical care and services *actually cost* constitutes overcompensation."  (Italics added.)

UCSD received payment from CMS in the amount of $74,433 for Michael's medical expenses.  UCSD agreed to accept that amount as "payment in full" for its services, pursuant to its contract with CMS, and agreed not to seek any further payment from Michael.  In their posttrial motion and at the hearing on that motion in the trial court, the defendants contended that the most that Michael could recover for his medical care and services was thus $74,433.  Michael argued in the trial court, and continues to argue on appeal, that a lien filed by UCSD on February 16, 2011, pursuant to the HLA, in the amount of $760,689.35 alters the *Hanif* analysis because the existence of the lien means that UCSD continues to claim that the full cost of Michael's care "remains owing."

Pursuant to the HLA, a hospital that treats a patient who has been injured by a third party tortfeasor may assert a lien against any judgment, settlement, or compromise recovered by that patient from the tortfeasor in the amount of its "reasonable and necessary charges" (Civ. Code, § 3045.1).  Under the HLA, any hospital "which furnishes emergency and ongoing medical or other services to any person injured by reason of an accident or negligent or wrongful act . . . shall, if the person has a claim against another

11

for damages on account of his or her injuries, have a lien upon the damages recovered, or to be recovered, by the person . . . to the extent of the amount of the reasonable and necessary charges of the hospital and any hospital affiliated health facility . . . ."  (Civ. Code, § 3045.1.)  "The lien shall apply whether the damages are recovered, or are to be recovered, by judgment, settlement, or compromise."  (Civ. Code, § 3045.2.)  A hospital's recovery on the lien is, however, limited "to an amount which could be satisfied from 50 percent of the" amount recovered by the injured person from the tortfeasor.  (*Newton v. Clemons* (2003) 110 Cal.App.4th 1, 6; Civ. Code, § 3045.4.)

In order to assert the lien, a hospital need not provide notice of the lien to the injured person.  But the lien "shall not be effective . . . unless a written notice . . .  is . . . mailed . . . to each" alleged tortfeasor "known to the hospital . . . ."  (Civ. Code, § 3045.3.)  If the tortfeasor pays the injured person "after the receipt of the notice as provided by Section 3045.3, without paying to the" hospital "the amount of its lien claimed in the notice, or so much thereof as can be satisfied out of 50 percent of the moneys due under any final judgment, compromise, or settlement agreement," then the tortfeasor "shall be liable to the" hospital "for the amount of its lien claimed in the notice which the hospital was entitled to receive as payment for medical care and services rendered to the injured person."  (Civ. Code, § 3045.4.)

Thus, "the HLA creates a 'statutory nonpossessory lien.'  [Citation.]"  (*Parnell v. Adventist Health System/West* (2005) 35 Cal.4th 595, 602 (*Parnell*).)  The lien " 'compensates a hospital for providing medical services to an injured person by giving

12

the hospital a direct right to a certain percentage of specific property, i.e., a judgment, compromise, or settlement, otherwise accruing to that person.' [Citation.]" (*Ibid.*)

Michael believes that because UCSD's lien in the amount of $760,689.35 has not been extinguished, UCSD could attempt to satisfy the full amount of its lien by asserting a right to his entire damage award. Under such a scenario, if the trial court's reduction of Michael's past medical damage award is permitted to stand, enforcement of the lien would effectively wipe out a significant portion of his judgment in this action. Michael thus seeks to have the jury's past medical damage award for $760,689.35 reinstated so that enforcement of the lien will not affect the remainder of the damages that the jury awarded to him.

According to Michael, under the authority of *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541 (*Howell*), the full $760,689.35 "remains owing" to UCSD, since UCSD perfected a Civil Code section 3045 lien. In *Howell*, the court held "that an injured plaintiff whose medical expenses are paid through private insurance may recover as economic damages no more than the amounts paid by the plaintiff or his or her insurer for the medical services received or still owing at the time of trial." (*Howell*, *supra*, at p. 566.) Michael focuses on the phrase "*or still owing.*" He contends that it should not matter which party owes the hospital for past medical services, and suggests that even though *he* might not owe the hospital the full $760,689.35 directly pursuant to the terms of the contract between CMS and UCSD and under *Hanif*, a third party defendant/insurer may in fact still owe the full amount pursuant to the HLA lien. In such a situation, he argues, if the lien asserts a claim for "the full charges" as set forth in the

hospital bill, then a plaintiff should be permitted to recover the full amount of the charges in an action against a third party, on the ground that such amounts are "still owing" to the hospital, and, under Michael's theory, the hospital could satisfy the $760,689.35 lien from his *entire* award, including those portions of the award that are intended to compensate him for damages other than past medical expenses.

We disagree with Michael's interpretation of the relevant authorities, and with his interpretation of the relevant contract between UCSD and CMS. Under the authority of *Parnell, supra,* 35 Cal.4th at page 605, "the HLA requires the existence of an *underlying debt owed by the patient* to the hospital." (Italics added.) Thus, where "a hospital received payment from a patient and his health insurer and agreed to accept that payment as 'payment in full' " for those services, that hospital may not recover "the difference between its usual and customary charges and the [lesser] amount [that it] received from the patient and his insurer" pursuant to an HLA lien. (*Parnell*, *supra*, at p. 598.)

The *Parnell* court explained, "The Community Hospital's contention that any recovery on a lien under the HLA comes from the tortfeasor—and not from the patient— does not alter our conclusion. As explained above, a lien under the HLA is simply a legal claim upon the property of another in satisfaction of a debt owed by a patient for medical services provided by the lien claimant. Thus, *absent an underlying debt, the hospital may not recover on the lien even assuming that the recovery comes from the tortfeasor*." (*Parnell*, *supra*, 35 Cal.4th at pp. 607-608, italics added.)

Michael is under the mistaken impression that there remains an underlying debt, as a result of the contract between UCSD and CMS. Specifically, Michael asserts that this

14

contract ensures that UCSD has "retained the right to seek recovery of the full charges incurred by the plaintiff/patient." Michael argues that under *Parnell*, a hospital can preserve its right to recover the difference between its usual and customary charges and the negotiated rate by contracting for this right, and maintains that UCSD has done so. The *Parnell* court did suggest that hospitals may contract with third party insurers for the right to recover the difference between the hospital's usual and customary rate and the negotiated rate through an HLA lien, stating: "In any event, we believe that the solution [to the problem of hospitals facing mounting financial pressures being exacerbated by not allowing them to recover the difference between usual and customary rate and negotiated rate pursuant to an HLA lien automatically] lies in the hands of the hospitals. By precluding the Community Hospital from asserting a lien under the HLA in this case, we 'simply give[] effect to' its contracts. (*Lopez v. Morley* (2004) 352 Ill.App.3d 1174, 1181.) *If hospitals wish to preserve their right to recover the difference between usual and customary charges and the negotiated rate through a lien under the HLA, they are free to contract for this right*. Our decision today does not preclude hospitals from doing so. (See, e.g., *Andrews*[ *v. Samaritan Health System et al.* (2001)] 36 P.3d [57,] 61.)" (*Parnell*, *supra*, 35 Cal.4th at p. 611, italics added, fn. omitted.)

Michael suggests that UCSD "negotiated and obtained" just such a right from CMS through its contract with CMS. We do not find support for this position in the record. The provisions in the contract between UCSD and CMS on which Michael apparently relies include the following paragraphs:

15

"[Exhibit C-1, section] 7.4  All payments made in accordance with this Agreement shall constitute payment in full for services rendered to CMS patients.  CONTRACTOR agrees not to bill or collect moneys from certified CMS patients for services for which payment has been made by COUNTY, except as provided in Exhibit D-1:5 Third Party Payer.

"[¶] . . . [¶]

"[Exhibit D-1, section] 5.4  In the event of a third party settlement or insurance settlement, CONTRACTOR may pursue the CMS patient for the amount of the third party settlement or insurance received by the patient or pursue the third party or insurer to obtain payment."

Since Exhibit D-1, section 5.4 is the only provision in the UCSD-CMS contract that discusses when the hospital may seek payment beyond the negotiated rate, Michael is apparently suggesting that any recovery that he obtains by way of judgment after trial in this case constitutes a "third party settlement" under the contract, and on this basis, further argues that UCSD will be able to pursue his judgment for the *full* amount of the lien.  We conclude that the reference in this contract to a "third party settlement or insurance settlement" cannot reasonably be understood to include a judgment after trial.

The term "third party settlement" is not defined in the contract.  However, when read as a whole, the contract's provisions demonstrate that "third party settlement" as used in Exhibit D-1, section 5.4 does not include a judgment awarded to the patient after trial.  First, the use of the word "settlement" indicates that this provision is referring to something other than a judgment.  (See *Mares v. Baughman* (2001) 92 Cal.App.4th 672, 676-677 (*Mares*).)  In response to an argument that "settlements are functionally the equivalent of judgments, such that reference to one infers [*sic*] or includes the other," the *Mares* court disagreed:  "While either [a settlement or a judgment] will generally bring an

16

end to a lawsuit, a settlement is an agreement between the parties to a dispute regarding how that dispute will be resolved. On the other hand, a judgment in a civil matter is the imposition of a resolution on the parties to a dispute as determined by a court. [Citation.] A judgment has implications that a settlement does not. [Citations.] Further, the mere fact that a party to a settlement may seek to transform it into a judgment for enforcement purposes (Code Civ. Proc., § 664.6) does not mean that the one is *necessarily* the equivalent of the other." (*Mares*, *supra*, 92 cal.App.4th at pp. 676-677.)

In addition to the fact that there is no reference in section 5.4 of Exhibit D-1 to a "judgment," another section related to section 5.4 of Exhibit D-1 provides some insight into why the phrase "third party settlement" cannot reasonably be interpreted as referring to a judgment after trial. In section 5.1 of Exhibit D-1, which is the first section under the heading "THIRD PARTY PAYOR"[8] (the same heading under which Exhibit D-1, section 5.4 is placed), UCSD agrees "to bill any third party payer or insurer for covered services rendered to a CMS patient when patient is *covered for those services*, either fully or partially, *by any public, private or group medical care or insurance program* or *third party settlement*." (Italics added.) Exhibit D-1, section 5.1 requires UCSD to bill third party payers or insurers when the patient is "covered for those services." Thus, UCSD is required to bill an insurer or a third party when that insurer or third party has agreed to provide "coverage" to the patient for the services that UCSD has provided,—i.e., when

---

8    The UCSD-CMS contract alternately uses the terms "payor" and "payer" at different points throughout the contract. We will retain the original spelling in quoting from the contract.

17

the insurer or third party has agreed to pay, in whole or in part, for such services. Given the phrasing of section 5.1 of Exhibit D-1, it seems clear that the references to a "third party settlement or insurance settlement" in section 5.4 of Exhibit D-1, refers to the settlement of an insurance claim or similar claim between the patient and a party that has agreed to "cover" the cost of certain medical services incurred by the patient. Similarly that section's granting UCSD the right to pursue "the CMS patient for the amount of the third party settlement or insurance received by the patient" or to pursue directly the "third party or insurer to obtain payment" allows the provider of medical services to seek payment from either the patient, if the patient has been paid by the insurer or third party for the services that party has agreed to "cover," or from an insurer or third party directly, when that party has agreed to pay for the patient's medical expenses.[9]

---

[9] The intervening sections between sections 5.1 and 5.4 of Exhibit D-1 do not detract from this interpretation of the contract. Section 5.2 of Exhibit D-1 provides:

> "Any amounts collected from a third party payer or insurer shall be retained by CONTRACTOR, and CONTRACTOR shall report these amounts to the COUNTY or designee with any claim requests. Claims may only be submitted to the COUNTY for those CMS patients for whom the amount received from the third party payer is less than the amount that would have been reimbursed by COUNTY for such services."

Section 5.3 of Exhibit D-1 provides:

> "CONTRACTOR shall notify COUNTY or designee of any claims to third parties or insurer filed and pending for eligible CMS patients, and shall notify COUNTY or designee of any payment received for CMS patients."

18

Given the context surrounding the term "third party settlement" in the UCSD-CMS contract in Exhibit D-1 section 5.4, it would be unreasonable to conclude that the phrase includes within its scope a judgment obtained by a plaintiff in a lawsuit against an alleged tortfeasor. We therefore conclude that, contrary to Michael's argument on appeal, UCSD did not contract with CMS for the right to recover against his judgment, beyond the payment that UCSD accepted from CMS as payment in full for Michael's hospital bills. Accordingly, pursuant to the authority of *Parnell*, we conclude that UCSD's right to recover against Michael's judgment in this lawsuit pursuant to its HLA lien is limited to the $74,433 that it agreed to accept from CMS as payment in full.

Given the fact that UCSD is not entitled to recover more than the $74,433 that it accepted as payment from CMS for Michael's care pursuant to its HLA lien, the trial court correctly determined that the amount that Michael may recover for past medical damages is $74,433, and, pursuant to the relevant authorities, properly reduced the jury's award to this amount.

We also reject Michael's contention that if we affirm the trial court's reduction of the award for past medical expenses, then a new trial on damages "is required" on the ground that the jury should not have heard evidence regarding the "full amount of medical bills." In making this contention, Michael apparently relies on *Howell*, *supra*, 52 Cal.4th at page 567. However, the *Howell* court did not require a new trial on damages in a situation in which a jury has heard evidence of the full amount of the medical bills. Rather, the *Howell* court advised that "[w]here a trial jury has heard evidence of the amount accepted as full payment by the medical provider [i.e., the negotiated amount] but

has awarded a greater sum as damages for past medical expenses, the defendant may move for a new trial on grounds of excessive damages." (*Ibid.*) That is not what occurred here. We therefore reject Michael's contention that he is entitled to a new trial on damages based on the court's reduction of his past medical damages.[10]

2. *The trial court's instruction did not coerce the jury into reaching a compromise verdict*

Michael contends that the trial court's instruction to the jury "after the jury reported that [it] had reached an impasse in [its] deliberations coerced the jurors into surrendering their conscientious convictions in order to reach agreement."

In making this argument, Michael fails to quote the statements the trial court made that Michael maintains "coerced" jurors into reaching a compromise verdict. It appears that Michael faults the trial court for failing to "tell the jury [it] had permission not to reach a verdict," and suggests that the trial court's instruction improperly told the jury that it was *required* to reach a verdict, rather than allowing the jurors to remain deadlocked. Our review of the record reveals that the trial court's instruction to the jury in the face of its impasse was neither coercive nor improper.

After the jury had deliberated for approximately two days, it sent a note to the trial court indicating that the jurors were at an impasse and asking the court what to do. After conferring with counsel and having been given authority by counsel to address the jury's

---

10    Even if it was improper for the jury to have heard evidence regarding the original billed amount for the medical services provided to Michael, we question whether Michael could demonstrate that *he* was prejudiced by the jury having heard this evidence.

20

question without counsel being present, the trial court called the jurors into the courtroom

and made the following statement to the jurors in response to their note:

> "Okay.  You say, 'Okay. Judge, we are at an impasse.  What do we
> do?  [¶]  Some suggestions.  Hopefully, they will be helpful.  Let me
> give you a couple.
>
> "The first thing to do is, if you can, try to just—just start over.  Kind
> of clear your mind.  What happens is when you get in a group
> dynamic, sometimes people get locked into certain positions, and
> that can be difficult.  So you kind of say, 'Okay.  Let's just open it up
> and do this.'
>
> "The best advice, and what I have said to other jurors is, 'Judge, we
> are stuck on a question'—okay?  And it can just be a broad question.
> I won't even make one up—'How do you resolve that?'
>
> "Here is what I have found to be most helpful that jurors have told
> me in the past.  Take that broad question and put it into as many
> subparts as you can.  So if it is a huge question, try to break it down.
> 'Can we agree on'—let's say it is one question.  'Can we make that
> five subparts; so at least we can agree on one thing, can't we?  The
> truck was red.'  Now, whether it ran the red light—but you start
> building consensus then.
>
> "So you want to take a broad question—some of these questions are
> really broad.  I understand that, 'Well, Judge, it is so'—'Is this
> negligence or whatever?'  That's a really broad question.
>
> "Try to break it down, subpart, subpart, and the more subparts you
> can make that in, agree to, you will find it is easier to come to a
> decision.
>
> "So what you want to do is break it down in as many subparts as you
> can and see if you can get some consensus on one and build on it.
> That can help you, believe it or not.  So try to take it and break it
> down.
>
> "The other thing is the jury instructions.  If you will go back and
> reread the jury instructions, if there is a particular point you are stuck
> on, say, you know, that is in there someplace.  And believe me, it is.
> I don't know where it is, whatever your question is, but it is in there.

So go back and look at the jury instructions. That's the law that is applicable to this case. You find—sometimes juries find that is helpful because this is what the law says. 'No, maybe not, but that's the law that I took an oath to follow.' So sometimes that is helpful.

"So take what you are [at] an impasse at, see if you can break it down to more questions. Do you understand what I'm trying to say? Break it down, because you are going to find out, if you can just break it down to the very basic, you are going to start agreeing on things. 'Okay. We do agree on this. We do agree on this.' And that will help you.

"And the other part—this is just human nature. That's the hard part. And let me tell you what I do sometimes. I make a ton of decisions every day, every day. And not so much in trial, because those are evidentiary decisions, but when I'm doing a case where they have waived jury, 'Okay, judge.' All the pressure is on me. 'You have got to make a decision. You have to call it.' Here is what I do.

"I kind of make my decision—this is what I did in family law. I did family law for three years. That's divorce court—let me tell you. But here is what I always do.

"Because I was worried about, I'm a male. Am I being fair to a female [litigant]? Do you understand what I am trying to say? Biases and stuff like that. So here is what I would do. [¶] I would make a decision. Then in my mind, 'Okay. This is what I'm going to order for all of the parties.' I reversed the parties. Boy, that is helpful.

"Do you understand what I just said to you? I would reverse the parties. If it was the male, and I'm ruling against the female, 'Okay, let's to make sure I'm not being biased one way or the other, now, in my mind, if I am going to rule for the female against the male, would I still come to the same conclusion?'

"That takes the bias away. We all come with biases. Everyone is. I am biased, but I try to prevent that when I'm on the bench; so I will reverse the parties. Sometimes that is a good thing for jurors to do. I'm locked into one position. 'Well, maybe '—'Hold on. What if I had to argue the other position?'

22

"It gets you to think about the other side instead of being so entrenched in your own decision.  [¶]  So that's why I said, kind of wipe it away.  Kind of put yourself in the other person's shoes for a minute.  That's usually helpful.  So you may want to do that.

"The one I find most helpful is to break it down.  Go break that down to as many questions as you can go to, because then you will start seeing you will have consensus.  You will be able to agree on things, and sometimes that will help.

"And then if you are really—look at the law.  'Hey, this is what the jury instruction says,' point blank.

"So there are three things that—at least from when I have gotten feedback from other jurors, say, 'You know, judge, that was kind of helpful.'  Just a thought.

"So keep an open mind.  Respect everybody.  You know, my chambers are right next to you.  So you sound like you are getting along pretty good, by what I'm hearing, just so you know, which is good.

"Okay.  Respect everybody.  You all respect everybody's views.  Listen to each other, and then most important, don't be afraid.  Maybe you should think about it a different way.  I do that.  [¶]  Sometimes I will have a preconceived idea, and then I go in and listen to counsel, and I go, 'Wow.  Here I thought I was going to rule this way.'  Keep an open mind.

"Hopefully[] this has been helpful to you all.  Okay?  [¶]  I will let you continue your deliberations.  Thank you."

The jury continued to deliberate for the remainder of the morning, and at approximately 12:10 p.m., the court adjourned for the day.  The following morning, the jury indicated to the court that it had reached its verdicts.

Michael complains that the dollar amounts in the jury's verdicts, and the timing between when the jury indicated that it was at an impasse and when it reached its verdicts, suggests that the jury ultimately reached compromise verdicts, and that it did so

23

only because the court gave a coercive instruction that improperly told the jury that it was required to reach a verdict, rather than allowing it to remain deadlocked.

Our review of the trial court's response to the jury's request for additional help in the face of an impasse does not lead us to conclude that the trial court coerced the jury into reaching a verdict. Rather, the court simply asked the jury to try to reach a consensus, and provided jurors with some ideas as to how they could approach their task in a manner that might lead to consensus.[11] The trial court's comments did not indicate that the jurors had no choice but to reach a consensus. We therefore reject Michael's contention that the trial court coerced the jury into reaching its verdicts.

3. *The trial court did not err in granting the defendants' motion to strike the request for punitive damages*

Prior to trial, the trial court excluded any evidence pertaining to Michael's claim for punitive damages, finding that there was insufficient evidence to support an award of punitive damages.

In a civil case not arising from the breach of a contractual obligation, a jury may award punitive damages "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a).) "Malice" is intentional injury *or* "despicable conduct which is carried on by the

---

[11] Although we conclude that the trial court did not coerce the jury into reaching a verdict through its instruction, the trial court's lengthy and somewhat rambling instruction in response to the jury's note that it was at an impasse was not a model of clarity. A trial court's decision to provide an extemporaneous instruction to a deadlocked jury is one fraught with potential peril. Courts would be well advised to limit an instruction in these circumstances to one that tracks the language provided in CACI No. 5013, entitled "Deadlocked Jury Admonition."

defendant with a willful and conscious disregard of the rights or safety of others."  (*Id.*, subd. (c)(1).)  "Oppression" is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights."  (*Id.*, subd. (c)(2).)

" 'Something more than the mere commission of a tort is always required for punitive damages.  There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent or evil motive on the part of the defendant, *or such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton*.'  [Citation.]"  (*Taylor v. Superior Court of Los Angeles County* (1979) 24 Cal.3d 890, 894-895 (*Taylor*).)

In this case, there was no allegation of fraudulent conduct by the defendants.  Nor can Michael's allegations against the defendants be considered to describe "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c)(2).)  Rather, in support of his argument that the evidence supports a punitive damages award, Michael points to evidence that he maintains establishes that the defendants' conduct amounted to the willful and conscious disregard for his safety, in that they failed to "investigat[e] the known problem of false alarms at plaintiff's apartment and others," and instead "chalked [David's] disabling of his alarm up to stupidity, joked about it, and gave it no further attention."  Michael also cites evidence regarding the resident manager at the apartment complex, whom he describes as a "self-styled 'bitch with a big broom,' " and argues that her testimony "reveal[s] a condescending, bullying attitude toward residents in general and their problems with smoke detectors in particular."

25

However, the evidence at trial clearly demonstrated that David never complained to management of the Majestic Apartments about his problems with his smoke detector, nor asked that anything be done to correct the problem. There had not been a fire at the Majestic Apartments in 40 years, and the defendants conducted routine maintenance of the smoke detectors, including conducting smoke alarm inspections and replacing the batteries in the alarms, every six months. Michael's expert conceded that this maintenance schedule exceeded the industry standard of care. The defendants replaced missing alarms, and replaced the alarms every eight years, even though replacement was recommended only every 10 years.

In order to justify an award of punitive damages on the ground of willful and conscious disregard for another's safety, the plaintiff must establish that the defendant was aware of the probable dangerous consequences of his conduct, and that he willfully and deliberately failed to avoid those consequences. (*Taylor*, *supra*, 24 Cal.3d 895-896.) We conclude that the trial court correctly determined that there was insufficient evidence to support a finding that the defendants willfully failed to do anything to avoid the dangerous consequences that might flow from the fact that a tenant had removed the smoke detector from the wall.

4. *The jury's damage award is not "inadequate as a matter of law"*

Michael contends that the jury's damage award is "inadequate as a matter of law" because the jury failed to compensate him for future pain and suffering. The jury was asked to determine what Michael's damages were for "Future Non-Economic Loss

26

Including Physical Pain/Mental Suffering." The jury concluded that Michael's "Future Non-Economic Loss" was $3,118.

Michael cites *Capelouto v. Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 893 (*Capelouto*) for the proposition that an award that fails to compensate for pain and suffering is inadequate as a matter of law when an injury is proven and special damages are awarded. In *Capelouto*, the court was concerned with the fact that the trial court had given a jury instruction that "conflict[ed] with the basic principles governing damages in tort actions," telling the jury that it could not award the plaintiff damages for her pain and suffering. (*Id*. at p. 893.) In concluding that the instruction at issue was improper, the *Capelouto* court acknowledged that "awards which fail to compensate for pain and suffering have been held inadequate as a matter of law." (*Ibid*.)

Michael appears to suggest that a jury award that does not compensate a plaintiff for *future* pain and suffering is inadequate as a matter of law. However, the authorities on which Michael relies in support of his argument discuss the failure to award any compensation at all for pain and suffering, and do not require an award for *future* pain and suffering in every case. (See, e.g., *Capelouto*, *supra*, 7 Cal.3d at pp. 892-893 [discussing complete failure to compensate for any "pain and suffering," but not distinguishing between past and future compensation for pain and suffering]; *Wilson v. R. D. Werner Co*. (1980) 108 Cal.App.3d 878, 883 [no distinction between past and future pain and suffering compensation].)

The jury did not fail to award Michael *any* compensation for his pain and suffering. In fact, the jury awarded Michael $300,000 in special damages for the pain

27

and suffering that he experienced after the fire and prior to trial. Further, the evidence was such that the jury could have reasonably concluded that this award was sufficient to fully compensate Michael for all of his pain and suffering.

The facts as to whether Michael continued to experience any pain and suffering at the time of trial, or would experience pain and suffering in the future, were in dispute, and there was substantial evidence that Michael had fully recovered from his injuries from the fire by the time of trial.[12] For example, there was evidence that by Michael's sixth day in the hospital, the soot was gone from his lungs and he was no longer sloughing off tissue lining. Airway burns are temporary, and Michael's were healed by the time he left the hospital. Further, according to Michael's medical records, by May 2006, Michael was doing well and had made an excellent recovery.

The director of the UCSD burn center, Dr. Marianne Cinat, examined Michael and concluded that he was healing very well and that most of his scarring was soft. He had no functional limitations, there was nothing that would indicate that he could not go back to work, and his future care would consist only of using moisturizing cream and sun protection.

---

[12]    The jury was asked to determine Michael's future *noneconomic* losses, including pain and suffering, and *was not* asked to determine whether Michael would have any future economic damages. The fact that the jury was not asked about future economic damages supports the idea that by the time of the trial in this case, Michael was no longer suffering from any injuries that required medical attention or prevented him from working. Given this, it is not surprising that there was substantial evidence presented to support a finding that Michael was not at risk of experiencing additional pain and suffering in the future.

UCSD psychologist Arpi Minassian, Ph.D., saw Michael on multiple occasions after Michael was discharged from the hospital. Dr. Minassian noted that Michael had returned to his job of air-brushing and was resuming his normal activities. Michael did not express any sadness or anxiety, and Dr. Minassian noted that Michael was "doing well." After talking with Michael during his last visit, Dr. Minassian concluded that Michael was not suffering from any psychological injury. During that visit, Michael denied feeling depressed and the doctor did not note any concerns about depression.

Michael admitted at trial that everything he had told his doctors was truthful. He agreed that he might have told Dr. Minassian that he was not depressed, that he had a good appetite, and that he was beginning to engage in his regular activities in December 2005, just a few months after the fire.

During his deposition, Michael said that he could not think of anything that he was unable to do because of the injuries he suffered in the fire. Michael posted on his MySpace page photographs of at least 20 airbrush murals that he had painted on automobiles in the time since his discharge from the hospital.

Although Michael had preexisting asthma at the time of the fire and used an inhaler, he admitted during his trial testimony that he very rarely used his inhaler at the time of trial. In addition, although Michael's doctor told him to stop smoking marijuana and to use his inhaler, Michael did neither. Further, Michael told one of his doctors that he smoked cigarettes.

For five years after the fire, Michael did not seek any medical treatment related to injuries that he sustained in the fire. He returned to work painting cars on May 18, 2006.

29

Michael played ultimate Frisbee and also went back to work as an electrician. Michael stated during his deposition that he had full mobility and flexibility, and that he had no plans to see any doctors for any condition attributable to the fire.

"Pain and suffering, by definition, is an abstract concept. It is not readily calculable through a convenient mathematical formula. Evidence of its precise monetary equivalent cannot be definitively presented as if it was past medical expenses or wages lost due to an injury." (*Garfoot v. Avila* (1989) 213 Cal.App.3d 1205, 1212.) Further, the adequacy of damages depends upon the facts of each case. (*Miller v. San Diego Gas & Electric Co*. (1963) 212 Cal.App.2d 555, 558; see also *Dodson v. J. Pacific, Inc*. (2007) 154 Cal.App.4th 931, 936 ["an award that does not account for pain and suffering is 'not necessarily inadequate as a matter of law' [citation]" because " '[e]very case depends upon the facts involved' [citation]"].) The jury in this case was presented with conflicting evidence regarding whether Michael continued to experience pain and suffering at the time of trial and/or might continue to do so. Indeed, there is substantial evidence that Michael was fully recovered by the time of trial and that he was no longer experiencing any pain or suffering as a result of the fire. Based on this evidence, the jury could have reasonably concluded that Michael would not experience any future pain and suffering as a result of the injuries he sustained from the fire. Given the state of the record, the jury's limited award of $3,118 for future non-economic loss cannot be deemed inadequate as a matter of law. We thus reject the contention that the jury's award was inadequate on the ground that it failed to compensate Michael for his future pain and suffering.

30

B.      *The defendants' cross-appeal*

1.      *The negligence claim*

a.      *There is substantial evidence to support the negligence verdict*

The defendants contend that Michael has conceded that he failed to establish that they caused the fire in the apartment, apparently suggesting that this "concession" undermines the jury's verdict.[13] Defendants further contend that there is insufficient evidence to support the jury's finding that they were negligent.

As an initial matter, we address the defendants' contention that Michael has conceded this issue. Contrary to the defendants' argument, Michael has not conceded that he did not present substantial evidence from which the jury could have concluded that the fire was started by something within the defendants' control. As Michael points out, he elected not to make the cause of the fire an issue in his appeal, and instead focuses on other matters, acknowledging the vast amount of evidence presented at trial concerning what may have caused the fire. This is different from conceding that there was insufficient evidence from which the jury could have concluded that either a faulty lamp or faulty wiring caused the fire.

Further, the evidence was such that the jury could have reasonably concluded that the defendants were negligent. Again, the jury was *not* asked to determine whether the

---

[13]      Although the defendants suggest that this "concession" undermines the jury's verdict, the jury was not asked to determine whether the defendants caused the fire that injured Michael. Rather, the jury was asked to determine whether the defendants were negligent, and, if so, whether such negligence was a "substantial factor in causing harm to" Michael.

31

defendants caused the fire that injured Michael.  Rather, the jury was asked to determine whether the defendants were negligent, and, if so, whether such negligence was a "substantial factor in causing harm to" Michael.  The jury could have concluded that the defendants' negligence was a substantial factor in causing harm to Michael based on a finding that the cause of the fire was attributable to the defendants' failure to exercise due care, such as their failure to properly maintain the wiring in the apartment or to ensure that safe lamps were being used in the apartment, or a finding that the fact that there was no working smoke alarm on the wall of the apartment at the time of the fire was in part attributable to defendants' failure to exercise due care.

In asserting a claim for negligence, " '[t]he plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. . . . '  [Citation.]"  (*Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205–1206.)  The plaintiff, however, "need not prove causation with absolute certainty.  Rather, the plaintiff need only ' "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." '  [Citation.]" (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1243.)

"Where findings of fact are challenged on appeal, we are bound by the 'elementary, but often overlooked principle of law, that . . . the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below.  [Citation.]" (*Garbell v. Conejo Hardwoods, Inc.* (2011) 193 Cal.App.4th 1563, 1569.)  "We must

32

therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor." (*Ibid.*) The substantial evidence standard of review applies to the jury's findings with respect to the elements of a claim for negligence. (*Ibid.*)

Determining what caused the fire, and even determining whether the defendants' conduct may have been in part responsible for the nuisance alarms that caused David to take down the smoke detector from the wall, were matters beyond common experience and therefore required expert testimony. (See Evid. Code, § 801, subd. (a).) With respect to the evidence from which the jury could have found that it was more likely than not that the defendants' negligence caused the fire, we start with the ample evidence presented by the parties that the possible causes of the fire included faulty electrical wiring in the apartment, a faulty lamp, a bong, or a candle. The lamp and wiring in the apartment were supplied by the defendants, while the bong and the candle were David's personal possessions. Although the El Cajon Fire Department investigated the fire, their concern was whether the fire was the result of arson. Having eliminated that possibility, the Department did not attempt to determine the precise cause of the fire. Instead, the Department left the determination of the cause of the fire up to private investigators. Although the El Cajon Fire Department collected the bong and what they believed was a candle holder, they left the rest of the remnants and debris from the fire at the site.

Michael presented the testimony of fire expert Robert Rowe, who stated that the standard of care for fire investigation is based on identifying all possible causes of a fire and then attempting to scientifically rule them out one by one until a cause is determined.

33

Rowe further testified that he could see the remnants of a lamp in photographs of the scene taken by the El Cajon Fire Department.[14] However, although the debris had been left at the scene by the El Cajon Fire Department, the defendants were unable to provide any of the lamp debris to Michael's experts to test.

According to Rowe, his analysis determined that it was unlikely that either the bong or the candle were the cause of the fire that injured Michael. The bong remained intact after the fire. Rowe noted that it would have been melted or fractured if it had been subjected to the high heat of the fire. Based on the appearance of the candle holder, Rowe concluded that it had been located somewhere outside the area of origin of the fire. Rowe determined from the evidence that the table lamp had been located in the area of the fire's origin.

There was also evidence presented that the defendants' insurer's investigator did not complete his investigation of the fire in compliance with the National Fire Protection Association's standards pertaining to collecting evidence and testing. Specifically, the investigator, Guy Robert Childress, did not collect either the wiring or electrical items such as the lamp, and consequently, did not submit those items for testing in a private laboratory.

Neither party included a written copy of the instructions that the court provided to the jury, and the trial court's reading of the jury instructions was not reported by the court

---

14    In addition, in a sketch of the apartment that he prepared just after the fire, David indicated that there was a lamp in the area where the experts agreed the fire appears to have started.

34

reporter, apparently by agreement of the parties.[15]  However, we are able to discern from other portions of the record that the trial court instructed the jury with CACI No. 203, which instructs the jury that it may distrust weaker evidence if a party could have provided stronger evidence,[16] and with CACI No. 204, which informs the jury that it may infer that willfully suppressed evidence would have been unfavorable to the party who suppressed it.[17]  Evidence Code section 413 provides: "In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case."

The jury was properly instructed that it could infer from the defendants' failure to sufficiently eliminate the apartment's wiring or a lamp as causes of the fire, and from the defendants' failure to maintain that evidence so that Michael's experts could conduct their own testing of it, that this evidence would have been damaging to the defendants.  The rule expressed in Evidence Code section 413 " 'is predicated on common sense, and public policy.  The purpose of a trial is to arrive at the true facts.  A trial is not a game

---

[15]  The instructions provided to a jury are often significant to a reviewing court and should, whenever practical, be included in the record on an appeal from a jury trial.

[16]  The standard CACI No. 203 instruction provides:  "You may consider the ability of each party to provide evidence.  If a party provided weaker evidence when it could have provided stronger evidence, you may distrust the weaker evidence."

[17]  The standard CACI No. 204 instruction provides:  "You may consider whether one party intentionally concealed or destroyed evidence.  If you decide that a party did so, you may decide that the evidence would have been unfavorable to that party."

35

where one counsel safely may sit back and refuse to produce evidence where in the nature of things his client is the only source from which that evidence may be secured. A defendant is not under a duty to produce testimony adverse to himself, but if he fails to produce evidence that would naturally have been produced he must take the risk that the trier of fact will infer, and properly so, that the evidence, had it been produced, would have been adverse.' [Citation.]" (*Williamson v. Superior Court* (1978) 21 Cal.3d 829, 835, fn. 2, italics omitted.)

Given the expert testimony, as well as the inference that the jury could have drawn that the evidence that the defendants' failed to retain would have been damaging to the defendants, we conclude that there is sufficient evidence to support a jury finding that the cause of the fire that injured Michael was attributable to something under defendants' control.

In addition, there was sufficient evidence from which the jury could have found that the defendants were negligent in their placement of the smoke detector, and that defendants had failed to ensure that the smoke detectors did not create unreasonable nuisance alarms that would cause tenants like David to remove them from the walls. The defendants admitted that they "had knowledge prior to the incident[] that tenants of the Majestic Apartments had previously disabled the smoke alarms in the units of the Majestic Apartments." Further, during each round of inspections of the smoke detectors that the defendants' employees completed, they found "at least one to two smoke detectors down," indicating an awareness of some sort of problem with the smoke detectors as installed in the apartments. In addition, the defendants did not provide the

tenants with a copy of the manufacturer's instructions that are included with the smoke detectors. In fact, it was not clear that the defendants' employees who helped install the smoke detectors had read the manufacturer's instructions. The resident property manager testified that she did not "recall" whether there were instructions in the smoke detector packages. This evidence is sufficient to support a finding that the defendants' knew that there was a problem with the smoke detectors that was causing tenants to remove the detectors from the walls, and that the defendants did nothing to attempt to remedy this problem. The jury could have reasonably concluded that the defendants' failure to remedy the nuisance problems with the smoke detectors was a substantial factor in causing Michael's harm.

In sum, there is substantial evidence to support the jury's finding that the defendants were negligent.

> b. *The trial court did not err in determining that David's conduct was not a superseding cause of Michael's damages*

The defendants seek to have this court determine that, based on all of the evidence, David's conduct can be determined to have been a superseding cause of Michael's damages, as a matter of law. Specifically, the defendants contend that it was David's conduct in removing the smoke alarm from the wall that caused Michael's injuries.

"Under the theory of supervening cause, the chain of causation that would otherwise flow from an initial negligent act is broken when an independent act intervenes and supersedes the initial act." (*Hardison v. Bushnell* (1993) 18 Cal.App.4th 22, 27.) Generally, "the issue whether an intervening force is superseding or not is a question of

37

fact for the jury to decide." (*Brewer v. Teano* (1995) 40 Cal.App.4th 1024, 1035.)
However, like questions of proximate cause, it may be decided as a matter of law "where only one reasonable conclusion may be reached." (*Ibid.*)

" 'Third party negligence which is the immediate cause of an injury may be viewed as a superseding cause when it is so highly extraordinary as to be unforeseeable. [Citations.] "The foreseeability required is of the risk of harm, not of the particular intervening act. In other words, the defendant may be liable if his conduct was 'a substantial factor' in bringing about the harm, though he neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred." [Citation.] It must appear that the intervening act has produced "harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible." [Citation.] [¶] . . . [F]oreseeability is a question for the jury unless undisputed facts leave no room for a reasonable difference of opinion. [Citations.] Thus, the issue of superseding cause is generally one of fact. [Citations.]' [Citation.]" (*Lawson v. Safeway Inc.* (2010) 191 Cal.App.4th 400, 417 (*Lawson*).)

The trial court instructed the jury with CACI No. 432. As is clear from the standard instruction, the burden of proof lies with the defendant seeking to avoid liability:

> "[Name of defendant] claims that [he/she/it] is not responsible for [name of plaintiff]'s harm because of the later misconduct of [insert name of third party]. To avoid legal responsibility for the harm, [name of defendant] must prove all of the following:

> "1. That [name of third party]'s conduct occurred after the conduct of [name of defendant];

"2. That a reasonable person would consider [name of third party]'s conduct as a highly unusual or an extraordinary response to the situation;

"3. That [name of defendant] did not know and had no reason to expect that [name of third party] would act in a [negligent/wrongful] manner; and

"4. That the kind of harm resulting from [name of third party]'s conduct was different from the kind of harm that could have been reasonably expected from [name of defendant]'s conduct." (CACI No. 432.)

The defendants argue that the evidence demonstrates that David did not have to take the alarm down, but nevertheless did so, and that as a result of David's actions, there was no working smoke alarm in the apartment when the fire started. However, the evidence does not establish, as a matter of law, that the defendants proved all of the elements of CACI No. 432 to establish that David's conduct was a superseding cause of Michael's injuries.

Based on the evidence presented at trial, there were multiple ways in which the jury could have determined that the defendants were negligent, including in their choice of a smoke detector, the placement of the smoke detector in the apartment, and even potentially the choice of lamps and/or maintenance of lamps and/or wiring in the apartment. The injuries that Michael suffered were from a fire. In order for David's intervening act of taking down the smoke detector to be deemed a superseding cause of Michael's injuries, it must appear from the evidence that David's act produced "harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible" (*Lawson*, *supra*, 191 Cal.App.4th at p.

39

417), or, as described by the CACI instruction, harm that was "different from the kind of harm that could have been reasonably expected from [the defendants'] conduct" (CACI No. 432). We cannot conclude that the defendants made such a showing as a matter of law. All of the alleged negligent acts led to a single harm to Michael—his fire-related injuries. Fire-related injuries can reasonably be expected to result both from the defendants' conduct as well as from David's conduct. Further, the facts were clearly in dispute, and reasonable people could come to different conclusions as to whose conduct was to blame. In these circumstances, we cannot say that the facts leave no room for a reasonable difference of opinion. We therefore must reject the defendants' argument that any negligence on their part was superseded by David's negligence, as a matter of law.

     c.     *The fact that there was evidence that Michael's own conduct contributed to his damages does not undermine the jury's determination that defendants were negligent*

The defendants present a short argument in which they appear to challenge the jury's conclusion that Michael was not solely to blame for his injuries. Specifically, the defendants argue that "[t]he jury clearly did not give due weight to the evidence that Plaintiff was so affected by alcohol and marijuana at the time of the fire and physically and mentally impaired that he could not react to the fire as a reasonable person would." In making this argument, the defendants simply rehash the evidence presented at trial regarding Michael's blood alcohol level at the time he was admitted to the hospital, as well as his marijuana use. The jury heard all of this evidence, and concluded that Michael bore 10 percent of the responsibility for his own injuries. Because we cannot say that the jury's conclusion with respect to its determination of the comparative

40

negligence of the parties involved was erroneous as a matter of law, we reject this argument.

2. *The trial court did not abuse its discretion by allowing Robert Griswold to testify regarding the placement of the alarm*

The defendants argue that the trial court abused its discretion by permitting plaintiff's expert Robert Griswold to testify regarding the placement of the smoke alarm in David's apartment and whether the placement was related to the nuisance alarms that David and Serena had experienced prior to the time of the fire. Griswold is the author of a book on property management, and was designated as an expert in "property management." In one portion of his book, Griswold discusses locating, installing, and testing smoke detectors prior to a tenant moving into an apartment.

Griswold testified that he would expect most on-site property managers to be aware of the proper distance from the ceiling that a wall-mounted smoke detector should be located.

Griswold noted that it appeared that defendants had installed the smoke detector in David's apartment on the wall approximately two inches from the ceiling. Griswold stated that from time to time in his property management experience, tenants have taken down smoke alarms as a result of being annoyed by the alarm being set off by the tenant's smoking or cooking.

At some point during Griswold's testimony, Michael's counsel attempted to ask Griswold what the instructions for installation of the smoke alarm say about placement of the alarm. Defense counsel objected to Griswold stating his opinions as to the location of

41

the smoke alarm, arguing that he had not been asked about his opinions regarding the manufacturer's recommendations concerning placement during his deposition. After some discussion, Michael's counsel noted that during his deposition, Griswold had talked about the fact that property managers should rely on manufacturer's instructions in attempting to solve problems with smoke detectors, and also that he had established a foundation for his testimony by studying the manufacturer's instructions and considering whether they had been violated. The trial court asked Griswold whether he felt qualified to answer a question as to where to place a smoke detector in an apartment. Griswold responded that he did feel qualified, that in fact it is the "basic function of a property manager when [one] go[es] through a unit to make sure it is rent ready, [to determine] the location and the fact that the smoke detector is there and is working." Griswold also stated that a property manager should know that placement of a smoke detector should be "generally 4 to 12 inches" from the ceiling.[18]

In order to testify as an expert, an individual must have enough knowledge, learning and skill pertaining to the relevant subject to speak with authority, and he or she must be familiar with the standard of care to which the defendant is to be held. (*Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 467 (*Avivi*), citing Evid. Code, § 720, subd. (a) and *Ammon v. Superior Court* (1988) 205 Cal.App.3d 783, 790-791.) An expert may base his or her opinion on any matter reasonably relied on by

---

[18]    In fact, some of the defendants' maintenance workers, as well as one of the owners of Delta Property Management Company, acknowledged that they were aware that the standard of care for placement of a smoke detector at the time of the fire was at least four and as many as 12 inches from the ceiling.

42

experts in forming opinions about the particular subject matter in question, except when the law precludes consideration of a particular matter. (*Avivi*, *supra*, at p. 467, citing Evid. Code, § 801, subd. (b).)[19] "A trial court exercises discretion when ruling on the admissibility of expert testimony under Evidence Code section 801, subdivision (b)." (*Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564.) This discretion extends to the trial court's ruling with respect to the reasonableness of the basis of the expert's testimony. (*Ibid*.)

It was reasonable for the court to conclude that Griswold was qualified to speak to the standard of care in property management regarding the proper placement of smoke detectors at the time of the fire at issue in this case. The defendants argue that Griswold's testimony "defies logic" because it makes little sense that an improperly placed smoke alarm would suffer from multiple nuisance alarms, yet would potentially not go off during a fire as a result of being mounted in "dead air space." However, this was an

---

[19]    Evidence Code section 801 provides:

> "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:
>
> "(a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and
>
> "(b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

argument for the jury to consider, and does not undermine the trial court's conclusion that Griswold could testify concerning his opinion as to whether the smoke detector had been mounted according to manufacturer's guidelines and whether such placement potentially rendered the smoke detector ineffective and/or prone to too many false alarms. We therefore reject the defendants' contention that the trial court abused its discretion in allowing Griswold to testify as he did.[20]

> 3. *The trial court did not abuse its discretion in allowing plaintiff's expert Gerard Moulin to testify regarding the possible causes of the fire*

The defendants contend that the trial court abused its discretion and committed prejudicial error when it permitted Michael to present the testimony of Gerard Moulin regarding possible causes of the fire. The defendants argue that "[i]t was not important to learn anything about Defendants' investigation of the cause of the fire" and that "[t]he only thing the jury needed to know was that no one was able to determine the cause of the fire."

---

[20] Within their argument regarding the trial court's admission of Griswold's testimony, the defendants make a related, albeit conceptually distinct, argument that the trial court also abused its discretion in not permitting them to offer the testimony of a second expert, Scott Bernet, an architect who designs apartment buildings, regarding the placement of smoke alarms in apartments. "Because this argument is not presented under a separate heading, it is forfeited. ([Citation]; Cal. Rules of Court, rule 8.204(a)(1)(B).)" (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 294.) However, even if we were to consider the argument on its merits, we would nevertheless conclude that the trial court did not abuse its discretion in declining to allow the defendants to present Scott Bernet's testimony, since the defendants were permitted to present the testimony of another expert regarding the issue of the location on a wall where a smoke detector should be placed. That expert testified in direct response to Griswold's contention that a smoke alarm should be placed between four and 12 inches below the ceiling, and expressly disagreed with Griswold's opinion.

44

After Michael proffered Moulin's testimony regarding the possible causes of the fire, as well as Moulin's remarks that there was evidence of a lighting fixture that had not been retained after the fire and thus was not available to him to inspect, the defendants brought a motion to preclude Moulin from testifying because he could not definitively state what had caused the fire. After hearing argument from the attorneys, the trial court determined that Moulin would be permitted to testify to the fact that he was unable to determine an exact cause of the fire, and that without being able to test the remnants of the lamp that can be seen in photographs of the aftermath of the fire scene but that were apparently not retained for later inspection, he could not rule out the lamp as the cause of the fire.

Moulin's testimony regarding his inability to determine the source of the fire, as well as his statement that he was unable to rule out the lamp as the cause of the fire because no remnants of the lamp had been retained, were clearly relevant to the issues raised at trial. The defendants presented evidence of their own investigation, as well as expert opinions tending to show that the cause of the fire could not have been the lamp or the wiring in the apartment, i.e., items for which the defendants were responsible. The trial court did not abuse its discretion in allowing Michael to present his own expert to question the quality of the defendants' investigation into the cause of the fire, and to challenge the findings of the defendants' experts with respect to the cause of the fire, particularly since the remains of the lamp were not made available to the plaintiff's experts, such that they were denied the opportunity to determine, at a minimum, whether sufficient remains were left to make testing of the remnants possible.

45

4. *The defendants were not prejudiced by the trial court's admission of evidence concerning maintenance evidence not related to smoke alarms*

The defendants contend that the trial court abused its discretion and prejudiced them by allowing David's wife, Serena, to testify regarding their dislike of the management at the Majestic Apartments, as well as about various complaints that she and David had about management's response to several problems they had with their apartment. For example, the defendants take issue with the fact that Serena was permitted to testify regarding a window screen that had apparently been stolen by an intruder, as well as management's response to this event, which was to require her to pay $25 to replace the screen. The defendants also complain that Serena was permitted to testify regarding the fact that if a tenant clogged a drain, the tenant was required to pay the $50 cost for snaking the drain. The defendants point out that there was no testimony regarding any failure by management with respect to proper maintenance of the smoke alarms, and that the introduction of the above evidence was prejudicial because it had the effect of making the defendants "seem uncaring and vindictive."

We agree with defendants that this evidence was irrelevant and should not have been admitted. However, we are not persuaded that this evidence was prejudicial to defendants. These small items of evidence were inconsequential in the context of the volumes of complex and relevant evidence that was presented to the jury in this case. In addition, Serena Johnson's testimony regarding these fairly trivial matters cannot be considered to have been inherently damaging. Requiring a tenant to pay for the cost of addressing a clogged drain or to bear the cost of replacing a screen, while perhaps less

46

than magnanimous, cannot be considered to be particularly reprehensible conduct on the part of a landlord.

Although the testimony regarding non-smoke alarm maintenance problems that David and Serena Johnson had with the Majestic Apartments management was irrelevant and for that reason should not have been admitted, we conclude that the defendant cannot demonstrate that a miscarriage of justice occurred as a result of the trial court's ruling. (See *Travelers Casualty and Surety Co. v. Employers Ins. of Wausau* (2005) 130 Cal.App.4th 99, 117, citing Cal. Const., art. VI, § 13, Evid. Code, §§ 353, 354.)

5.     *The defendants have forfeited their argument that the trial court abused its discretion in admitting evidence regarding a faulty lamp that David had disposed of prior to the fire*

The defendants maintain that the trial court prejudicially abused its discretion by allowing David to testify regarding a faulty lamp that he had disposed of approximately a year prior to the fire. The defendants contend that David's testimony about a lamp that he threw away after hearing a zapping sound coming from the lamp and seeing that the bulb was black and charred was prejudicial because "it was a springboard for much expert testimony regarding examination of similar lamps at the Majestic Apartments." The defendants assert that the jury "may very well have determined liability against the Defendants based solely on the erroneous belief that the lamp started the fire." However, the defendants have not directed us to any portion of the record in which they registered an objection to any of David's testimony on this subject.

> " 'In order to preserve an issue for appeal, a party ordinarily must raise the objection in the trial court. [Citation.] "The rule that contentions not raised in the trial court will not be considered on

47

appeal is founded on considerations of fairness to the court and opposing party, and on the practical need for an orderly and efficient administration of the law." [Citations.] Otherwise, opposing parties and trial courts would be deprived of opportunities to correct alleged errors, and parties and appellate courts would be required to deplete costly resources "to address purported errors which could have been rectified in the trial court had an objection been made." [Citation.] In addition, it is inappropriate to allow any party to "trifle with the courts by standing silently by, thus permitting the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable." [Citation.]' [Citation.]" (*Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 799-800 (*Dietz*).)

" 'The *party also must cite to the record showing exactly where the objection was made*. [Citation.] When an appellant's brief makes no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly made. [Citations.] We can simply deem the contention to lack foundation and, thus, to be forfeited. [Citations.]' " (*Dietz*, *supra*, 177 Cal.App.4th at p. 800, italics added.) Because the defendants have not cited to the pages of the record where an objection to this testimony was made, we deem the contention forfeited.

## IV.

## DISPOSITION

The judgment of the trial court is affirmed. The parties shall bear their own costs on appeal.

AARON, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.

48